Richmond

## MARCUS ALBERT PAYNE

## V.

## COMMONWEALTH OF VIRGINIA

November 21, 1979.

Record No. 781578.

Present: All the Justices.

*Harry Toussaint Alexander* [*D.C.*] (*Robert M. Alexander,* on brief), for appellant.
*Alan Katz, Assistant Attorney General* (*Marshall Coleman, Attorney General,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

In this criminal appeal, we shall determine whether defendant was deprived of a fair trial as the result of the prosecution's alleged failure to disclose information claimed to be exculpatory.

This appeal arises from the same series of events which generated our recent decision in *Dozier* v. *Commonwealth,* 219 Va. 1113, 253 S.E.2d 655 (1979). In fact, the handwritten statement which was the subject of *Dozier* is involved here.

In a lengthy jury trial held in November of 1977, defendant Marcus Albert Payne was found guilty of rape, sodomy and abduction of a female under sixteen years of age for the purposes of prostitution. The jury fixed the punishment at confinement in the penitentiary for a total of 39 years.

In March of 1978, defendant filed several post-trial motions asserting that new evidence had been discovered which required either that new trials be granted or that the indictments be dismissed. He alleged discovery of the fact that the prosecution had concealed exculpatory evidence from the defendant and referred to: (1) a report written by the victim for the police shortly after the offenses had been committed, and (2) a photograph, part of a display shown to the victim by the police, from which it appears the victim may have identified a person other than defendant as being the perpetrator of the crimes. Following an evidentiary hearing in May of 1978, the court below overruled the motions and confirmed the jury's verdicts in orders entered in July of 1978. We granted this appeal from the judgments of conviction and limited it to consideration of the question whether "the Commonwealth withheld exculpatory evidence."

On Monday, January 17, 1977, the victim, Cindy Floyd, 13 years of age and a resident of Northern Virginia, left school intending to run away from home. She was accompanied by another 13-year-old, Angel Finchum. They rode a bus to the District of Columbia where they remained the rest of that day and all of the next. During that time they met "Bunny," another juvenile. In the early morning hours of

Wednesday, January 19, Cindy and Angel were in Eddie Leonard's, a fast food restaurant in the District. While there, defendant and one Leon Robinson entered the establishment and approached them. Defendant initiated a conversation with Cindy and asked her to go to Las Vegas with him. Cindy declined, indicating she wished to return home. During the conversation, Payne grabbed Cindy's arm and later forcibly removed her from the restaurant, assisted by Robinson. In the meantime, Angel had gone to telephone her aunt to ask her to come and pick up the girls.

Defendant and Robinson placed Cindy in an automobile and drove her to the South Gate Motel in Arlington. Defendant registered at the motel and the two men took the victim to the room assigned by the night clerk. After the trio entered the room, Robinson departed to return to Washington to get Angel. Then defendant drew a gun from his pocket, displayed it to Cindy, and placed it under a pillow of one of the beds. He started talking about prostitution and asked Cindy if she would "work for him." Cindy testified she consented to becoming a prostitute in the employ of defendant because, she said, "he was bigger than me and he was black and he had a gun." Shortly thereafter, Robinson returned without Angel. Then the victim was raped and sodomized by defendant.

Later that morning, Cindy was taken by defendant and Robinson to the Arna Valley Apartments in Arlington. Tracy Scott, a prostitute, was present in the apartment. Defendant then gave Cindy detailed instructions about being a prostitute and how much to charge. As a result, Cindy was taken to a number of places by Scott and by "Peaches," a friend of Scott, so that Cindy could carry out defendant's instructions. Later, Scott returned Cindy to defendant after Cindy refused to solicit for prostitution. Upon learning of her refusal, defendant slapped Cindy, then drove her into Washington and released her near a McDonald's restaurant.

Cindy entered the restaurant to use a telephone so she could try to locate Angel and Bunny. While there, Cindy was introduced to "Tony," the defendant in *Dozier, supra.* Dozier promised to help Cindy locate her friends but, instead, took her back to the Arna Valley Apartments. Eventually, on Friday, January 21, Cindy was able to get away from Dozier in Washington where she was picked up by the D.C. police as a "runaway."

Cindy was then taken to a Washington police facility. After her father arrived and upon request of the police, she prepared the following handwritten report, quoted below complete with errors in spelling, punctuation and syntax:

got in D.C. at           .

rode Metrobus from Mt. Vernon into D.C. went to a restaurant to get something to drink. went walking around. met a girl named bunny smith. went to McDonalds got something to eat. went walking around bunny got a hotel room We stayed there Monday Night. Then went to McDonalds to eat Breakfast. bunny was sick so we stayed in McDonalds for about 5 hours 7-1:00. Bunny was trying to get some money to get the bus so me and angel could go home. Bunny's Boy friend offered us a ride home. a friend of his told us to run when we get outside Because he wasn't going to take us home. So when we got outside me angel and Bunny ran. we went to Eddie leanord's restaurant. Somebody said our parents were coming to pick us up. then some guy by the name of Markus was talking to me and made me get in the car and drove to the wagon wheel motel and made me have sex with him. He pulled out a gun and put it under his pillow. The next morning he took me to some apartment named arnu valley in arlington. and wanted me to make some money for him but I wouldn't do it. So he hit me with his hand twice and dropped me off at McDonalds. then I went to find Bunny. to see where angel was But I didn't see bunny. I heard the police picked her up. and some guy started talking to me and said he would take me where bunny was. but instead he took me to the apartments at arnu valley and wanted me to work on the streets. So he got me an id card. So if a police stops me I Just show them it. so friday night I went to find Bunny. So I could go home, but I didn't find her. the police picked me up and took me to the police station.

Cindy Floyd

Subsequently on March 10, 1977, during the investigation being conducted by the Arlington police, Detective Kenneth John Madden was present when a series of photographs was exhibited to Cindy in an effort to identify "Marcus." During that interview, which was recorded on tape, Cindy was shown pictures of eight individuals, none of which was of defendant Marcus Payne. Holding one of the photos, Madden asked, "Is that the one that is Marcus?" Cindy responded, "That looks like him, but I am not sure." Madden thereupon wrote with red ink on the reverse side of the picture, "This is marcus," signed his name and had Cindy write her initials there.

During the proceedings prior to trial, the court below ordered the prosecution to furnish defendant, "to the extent required by the

Brady case," with the material requested in the following portion of a motion for discovery filed by defendant:

> All information of whatever form or nature and from any source whatsoever that tends to exculpate the defendant either through an indication of his innocence or through the potential impeachment of any Commonwealth witness, and all such information which may lead to evidence which tends to exculpate the defendant whether by indicating his innocence or impeaching the credibility of any potential Commonwealth witness.

On appeal, through counsel who did not participate at the trial stage, defendant contends the prosecution failed to disclose to his attorneys prior to trial the existence of either the statement or the photograph, and constitutional error has thus occurred requiring reversal of the convictions.

We dispose of the issue relating to the picture in summary fashion. The trial court found that all relevant photographs, including the one claimed to be exculpatory, had been shown to defendant's attorneys prior to trial. The court below concluded that such disclosure had been made by the prosecutor not only to defendant's trial counsel, but also to another attorney who represented defendant during the period immediately following his arrest up to the time trial counsel entered the case. This finding of fact is supported by credible evidence adduced at the post-trial hearing and we shall not overturn it on appeal. Consequently, we do not reach a constitutional issue as to the photograph.

We now focus on the statement in question, which was not made available to any of defendant's attorneys until after the trial. Defendant argues the handwritten account "conflicted drastically" with Cindy's testimony at trial. Specifically, defendant notes the following discrepancies: her written statement indicated she was taken to the motel by only one man; it identified the place as the Wagon Wheel Motel; it failed to state that several sex acts occurred; and it made no mention of Robinson or Tracy Scott. At the bar, defendant also argued that this case is controlled by our decision in *Dozier* and should be reversed for the same reasons set forth in that case. We do not agree.

In *Dozier,* addressing a charge of abduction, we noted defendant made an express request for specific evidence. There, during the trial held a month after Payne's trial, defense counsel became aware of Cindy's written report and requested a copy. The statement was not

then produced. We decided that because the statement failed to name Dozier as an abductor, such omission "bore directly upon the credibility of her abduction testimony." 219 Va. at 1118, 253 S.E.2d at 658. Applying the rule of *Brady* v. *Maryland,* 373 U.S. 83 (1963), we said that the suppressed evidence "might have affected" the outcome of Dozier's trial and held that Dozier's constitutional right to a fair trial had been infringed.

But in the present case, unlike *Dozier,* only a general, non-specific request for exculpatory matter was made. This is precisely the situation presented in *United States* v. *Agurs,* 427 U.S. 97 (1976). In that case, the Supreme Court considered the proper standard of materiality to be applied in such a situation, based on a post-trial motion, when there had been non-disclosure of exculpatory evidence in the hands of the prosecutor. The Court held, as we noted in *Dozier,* 219 Va. at 1116, 253 S.E.2d at 657, that under such circumstances "if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." 427 U.S. at 112. The Court explained that "the omission must be evaluated in the context of the entire record." *Id.* The Court stated that a new trial is not justified when "there is no reasonable doubt about guilt whether or not the additional evidence is considered," *id.* at 112-13, but pointed out that "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* at 113.

So, as our analysis in *Dozier* pointed out, entirely different standards of materiality govern an *Agurs* situation on the one hand and a pure *Brady* situation on the other. Consequently, this case is not controlled by *Dozier.*

Turning to the present case, we will evaluate the importance of Cindy's written report to determine whether the trial judge, who concluded this was an *Agurs* situation, correctly decided that admission of the statement would not have created a reasonable doubt in the minds of the triers of fact that did not otherwise exist.

The effect of defendant's argument is that the principal value of Cindy's statement would have been in discrediting her as a witness. Insofar as Payne was concerned, the report contains no pure exculpatory material, only information which arguably may be used to impeach. Actually, defendant's attack on the writing is mainly directed to what is omitted from the report rather than what is included. Thus we assess the impeachment value of such omissions in the context of the issues of fact arising at the trial.

Identification of the perpetrator of the crimes was the principal

factual question in the case. Cindy identified defendant as her assailant both during the trial and when other photographs were shown to her after the March 1977 interview previously discussed. Payne's identification, however, did not depend solely on Cindy's testimony. Other prosecution witnesses either positively identified the accused as being at the South Gate Motel and the Arna Valley Apartments at the times in question or gave testimony supporting the conclusion that Payne accompanied Cindy at those locations. We believe, therefore, that even if it be assumed that Cindy's identification testimony would have been in some way discredited by admission of her written statement, the remaining evidence in the record would support the identification of Payne as the perpetrator beyond a reasonable doubt.

In addition, the statement is consistent in every significant particular with the victim's testimony about defendant's activities. The only possible inconsistency is the reference in the report to the "Wagon Wheel Motel." This apparent discrepancy was explained during the trial when it was revealed that a sign identifying the Wagon Wheel Restaurant was in front of the South Gate Motel thus causing Cindy to give an erroneous name to the motel. Finally, Cindy's failure to mention Robinson, Scott and the specific number of sex acts in the statement is inconsequential when considered with the whole evidence at trial. Cindy's testimony at trial as to those particulars was fully corroborated by other evidence.

In sum, we hold the trial court correctly decided that no constitutional error resulted from non-disclosure of the statement in question because the omitted evidence did not create a reasonable doubt that did not otherwise exist; there is no reasonable doubt as to Payne's guilt whether or not the additional evidence is considered.

In conclusion, we note that defendant on brief and at bar has debated questions which are beyond the scope of the issues argued in the petition for appeal in support of the Assignment of Error: "The Commonwealth withheld exculpatory evidence." When, as here, we limit the writ of error, the scope of the argument thereafter may not be expanded to include alleged errors not previously relied on in support of the assignment of error to which the appeal was limited. Consequently, we will take no notice of those issues which are now irrelevant on appeal.

For the foregoing reasons, the judgments of conviction will be

*Affirmed.*