# RAMDASS *v.* ANGELONE, DIRECTOR, VIRGINIA DEPARTMENT OF CORRECTIONS

No. 99–7000.   Argued April 18, 2000—Decided June 12, 2000

158

KENNEDY, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST, C. J., and SCALIA and THOMAS, JJ., joined. O'CONNOR, J., filed an opinion concurring in the judgment, *post*, p. 178. STEVENS, J., filed a dissenting opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined, *post*, p. 182.

*David I. Bruck* argued the cause for petitioner. With him on the briefs were *F. Nash Bilisoly,* by appointment of the Court, 528 U. S. 1152, *John M. Ryan,* and *Michele J. Brace.*

*Katherine P. Baldwin,* Assistant Attorney General of Virginia, argued the cause for respondent. With her on the brief was *Mark L. Earley,* Attorney General.

JUSTICE KENNEDY announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE THOMAS join.

Petitioner received a death sentence in the Commonwealth of Virginia for murder in the course of robbery. On review of a decision denying relief in federal habeas corpus, he seeks to set aside the death sentence in reliance on *Simmons* v. *South Carolina,* 512 U.S. 154 (1994). He argues the jury should have been instructed of his parole ineligibility based on prior criminal convictions. We reject his claims and conclude *Simmons* is inapplicable to petitioner since he was not parole ineligible when the jury considered his case, nor would he have been parole ineligible by reason of a conviction in the case then under consideration by the jury. He is not entitled to the relief he seeks.

I

Sometime after midnight on September 2, 1992, Mohammed Kayani was working as a convenience store clerk. Petitioner Bobby Lee Ramdass and his accomplices entered the store and forced the customers to the floor at gunpoint. While petitioner ordered Kayani to open the store's safe, accomplices took the customers' wallets, money from the cash registers, cigarettes, Kool Aid, and lottery tickets. When Kayani fumbled in an initial attempt to open the safe, petitioner squatted next to him and yelled at him to open the safe. At close range he held the gun to Kayani's head and pulled the trigger. The gun did not fire at first; but petitioner tried again and shot Kayani just above his left ear, killing him. Petitioner stood over the body and laughed. He later inquired of an accomplice why the customers were not killed as well.

The murder of Kayani was no isolated incident. Just four months earlier, after serving time for a 1988 robbery conviction, petitioner had been released on parole and almost at once engaged in a series of violent crimes. In July, petitioner committed a murder in Alexandria, Virginia. On August 25, petitioner and three accomplices committed an armed robbery of a Pizza Hut restaurant, abducting one of the victims. Four days later, petitioner and an accomplice pistol-whipped and robbed a hotel clerk. On the afternoon of August 30, petitioner and two accomplices robbed a taxicab driver, Emanuel Selassie, shot him in the head, and left him for dead. Through major surgery and after weeks of unconsciousness, Selassie survived. The same day as the Selassie shooting, petitioner committed an armed robbery of a Domino's Pizza restaurant.

The crime spree ended with petitioner's arrest on September 11, 1992, nine days after the Kayani shooting. Petitioner faced a series of criminal prosecutions. For reasons we discuss later, the sequence of events in the criminal proceedings is important to the claim petitioner makes in this Court. Under Virginia law, a conviction does not become final in the trial court until two steps have occurred. First, the jury must return a guilty verdict; and, second, some time thereafter, the judge must enter a final judgment of conviction and pronounce sentence, unless he or she determines to set the verdict aside. On December 15, 1992, a jury returned a guilty verdict based on the Pizza Hut robbery. On January 7, 1993, a jury rendered a guilty verdict for the Domino's robbery; on January 22, the trial court entered a judgment of conviction on the Pizza Hut verdict; on January 30, the sentencing phase of the Kayani murder trial was completed, with the jury recommending that petitioner be sentenced to death for that crime; and on February 18, the trial court entered judgment on the Domino's verdict. After his capital trial for the Kayani killing, petitioner pleaded guilty to the July murder in Alexandria and to the shooting of

Selassie. Thus, at the time of the capital sentencing trial, a final judgment of conviction had been entered for the Pizza Hut crime; a jury had found petitioner guilty of the Domino's crime, but the trial court had not entered a final judgment of conviction; and charges in the Alexandria murder had not yet been filed, and indeed petitioner had denied any role in the crime until sometime after the sentencing phase in the instant case.

At the sentencing phase of the capital murder trial for Kayani's murder, the Commonwealth submitted the case to the jury using the future dangerousness aggravating circumstance, arguing that the death penalty should be imposed because Ramdass "would commit criminal acts of violence that would constitute a continuing serious threat to society." Va. Code Ann. § 19.2–264.4(C) (1993). Petitioner countered by arguing that he would never be released from jail, even if the jury refused to sentence him to death. For this proposition, Ramdass relied on the sentences he would receive for the crimes detailed above, including those which had yet to go to trial and those (such as the Domino's crime) for which no judgment had been entered and no sentence had been pronounced. Counsel argued petitioner "is going to jail for the rest of his life. . . . I ask you to give him life. Life, he will never see the light of day . . . ." App. 85. At another point, counsel argued: " 'Ramdass will never be out of jail. Your sentence today will insure that if he lives to be a hundred and twenty two, he will spend the rest of his life in prison.' " 187 F. 3d 396, 400 (CA4 1999). These arguments drew no objection from the Commonwealth.

The prosecution's case at sentencing consisted of an account of some of Ramdass' prior crimes, including crimes for which Ramdass had not yet been charged or tried, such as the shooting of Selassie and the assault of the hotel clerk. Investigators of Ramdass' crimes, an accomplice, and two victims provided narrative descriptions of the crime spree preceding the murder, and their evidence of those crimes

was the basis for the prosecution's case in the sentencing hearing. Evidence of the crime spree did not depend on formal convictions for its admission. The prosecutor, moreover, did not mention the Domino's crime in his opening statement and did not introduce evidence of the crime during the Commonwealth's case in chief. App. 8–47. Ramdass himself first injected the Domino's crime into the sentencing proceeding, testifying in response to his own lawyer's questions about his involvement in the crime. In closing, the prosecutor argued that Ramdass could not live by the rules of society "either here or in prison." *Id.*, at 86.

During the juror deliberations, the jury sent a note to the judge asking: "'[I]f the Defendant is given life, is there a possibility of parole at some time before his natural death?'" *Id.*, at 88. Petitioner's counsel suggested the following response: "'"You must not concern yourself with matters that will occur after you impose your sentence, but you may impose *[sic]* that your sentence will be the legal sentence imposed in the case."'" *Id.*, at 89. The trial judge refused the instruction, relying on the then-settled Virginia law that parole is not an appropriate factor for the jury to consider, and informed the jury that they "'are not to concern [them]selves with what may happen afterwards.'" *Id.*, at 91. The next day the jury returned its verdict recommending the death sentence.

Virginia law permitted the judge to give a life sentence despite the jury's recommendation; and two months later the trial court conducted a hearing to decide whether the jury's recommended sentence would be imposed. During the interval between the jury trial and the court's sentencing hearing, final judgment had been entered on the Domino's conviction. At the court's sentencing hearing, Ramdass' counsel argued for the first time that his prior convictions rendered him ineligible for parole under Virginia's three-strikes law, which denies parole to a person convicted of three separate felony offenses of murder, rape, or armed

robbery, which were not part of a common act, transaction, or scheme. Va. Code Ann. § 53.1–151(B1) (1993). Petitioner's counsel also stated that three jurors contacted by petitioner's counsel after the verdict expressed the opinion that a life sentence would have been imposed had they known Ramdass would not be eligible for parole. These jurors were not identified by name, were not produced for testimony, and provided no formal or sworn statements supporting defense counsel's representations. App. 95. Rejecting petitioner's arguments for a life sentence, the trial court sentenced petitioner to death.

Ramdass appealed, arguing that his parole ineligibility, as he characterized it, should have been disclosed to the jury. The Virginia Supreme Court rejected the claim, applying its settled law "that a jury should not hear evidence of parole eligibility or ineligibility because it is not a relevant consideration in fixing the appropriate sentence." *Ramdass* v. *Commonwealth*, 246 Va. 413, 426, 437 S. E. 2d 566, 573 (1993). The court did not address whether Ramdass had waived the claim by failing to mention the three-strikes law at trial or by not objecting to the instructions that were given. Other Virginia capital defendants in Ramdass' position had been raising the issue at trial, despite existing Virginia law to the contrary. *E. g., Mickens* v. *Commonwealth*, 249 Va. 423, 424, 457 S. E. 2d 9, 10 (1995); *O'Dell* v. *Thompson*, 502 U. S. 995, 996–997, n. 3 (1991) (Blackmun, J., respecting denial of certiorari); *Mueller* v. *Commonwealth*, 244 Va. 386, 408–409, 422 S. E. 2d 380, 394 (1992); *Eaton* v. *Commonwealth*, 240 Va. 236, 244, 397 S. E. 2d 385, 390 (1990).

From the State Supreme Court's denial of his claims on direct review, Ramdass filed a petition for a writ of certiorari in this Court. One of his arguments was that the judge should have instructed the jury that he was ineligible for parole. While the petition was pending, we decided *Simmons* v. *South Carolina*, 512 U. S. 154 (1994), which held that where a defendant was parole ineligible under state law at

the time of the jury's death penalty deliberations, the jury should have been informed of that fact. We granted Ramdass' petition for certiorari and remanded the case for reconsideration in light of *Simmons*. *Ramdass* v. *Virginia*, 512 U. S. 1217 (1994).

On remand, the Virginia Supreme Court affirmed Ramdass' death sentence, concluding that *Simmons* applied only if Ramdass was ineligible for parole when the jury was considering his sentence. *Ramdass* v. *Commonwealth*, 248 Va. 518, 450 S. E. 2d 360 (1994). The court held that Ramdass was not parole ineligible when the jury considered his sentence because the Kayani murder conviction was not his third conviction for purposes of the three-strikes law. In a conclusion not challenged here, the court did not count the 1988 robbery conviction as one which qualified under the three-strikes provision. (It appears the crime did not involve use of a weapon.) The court also held the Domino's robbery did not count as a conviction because no final judgment had been entered on the verdict. Thus, the only conviction prior to the Kayani murder verdict counting as a strike at the time of the sentencing trial was for the Pizza Hut robbery. Unless the three-strikes law was operative, Ramdass was eligible for parole because, at the time of his trial, murder convicts became eligible for parole in 25 years. Va. Code Ann. § 53.1–151(C) (1993). Under state law, then, Ramdass was not parole ineligible at the time of sentencing; and the Virginia Supreme Court declined to apply *Simmons* to reverse Ramdass' sentence.

Ramdass filed a petition for a writ of certiorari contending that the Virginia Supreme Court misapplied *Simmons*, and we denied certiorari. *Ramdass* v. *Virginia*, 514 U. S. 1085 (1995). After an unsuccessful round of postconviction proceedings in Virginia courts, Ramdass sought habeas corpus relief in federal court. He argued once more that the Virginia Supreme Court erred in not applying *Simmons*. The District Court granted relief. 28 F. Supp. 2d 343 (ED Va.

1998).  The Court of Appeals reversed.  187 F. 3d, at 407. When Ramdass filed a third petition for a writ of certiorari, we stayed his execution, 528 U. S. 1015 (1999), and granted certiorari, 528 U. S. 1068 (2000).  Ramdass contends he was entitled to a jury instruction of parole ineligibility under the Virginia three-strikes law.  Rejecting the contention, we now affirm.

## II

Petitioner bases his request for habeas corpus relief on *Simmons, supra.*  The premise of the *Simmons* case was that, under South Carolina law, the capital defendant would be ineligible for parole if the jury were to vote for a life sentence.  Future dangerousness being at issue, the plurality opinion concluded that due process entitled the defendant to inform the jury of parole ineligibility, either by a jury instruction or in arguments by counsel.  In our later decision in *O'Dell* v. *Netherland,* 521 U. S. 151, 166 (1997), we held that *Simmons* created a new rule for purposes of *Teague* v. *Lane,* 489 U. S. 288 (1989).  *O'Dell* reaffirmed that the States have some discretion in determining the extent to which a sentencing jury should be advised of probable future custody and parole status in a future dangerousness case, subject to the rule of *Simmons.*  We have not extended *Simmons* to cases where parole ineligibility has not been established as a matter of state law at the time of the jury's future dangerousness deliberations in a capital case.

Whether Ramdass may obtain relief under *Simmons* is governed by the habeas corpus statute, 28 U. S. C. § 2254(d)(1) (1994 ed., Supp. III), which forbids relief unless the state-court adjudication of a federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  As explained in JUSTICE O'CONNOR's opinion for the Court in *Williams* v. *Taylor,* 529 U. S. 362, 412–413 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule

that contradicts our prior holdings or if it reaches a different result from one of our cases despite confronting indistinguishable facts. The statute also authorizes federal habeas corpus relief if, under clearly established federal law, a state court has been unreasonable in applying the governing legal principle to the facts of the case. A state determination may be set aside under this standard if, under clearly established federal law, the state court was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled. The Virginia Supreme Court's ruling in the case before us was neither contrary to *Simmons* nor an unreasonable application of its rationale.

Petitioner contends his case is indistinguishable from *Simmons*, making the Virginia Supreme Court's refusal to grant relief contrary to that case. In his view the Pizza Hut conviction and the Domino's guilty verdict classified him, like the *Simmons* petitioner, as ineligible for parole when the jury deliberated his sentence. He makes this argument even though the Virginia Supreme Court declared that he was not parole ineligible at the time of the sentencing trial because no judgment of conviction had been entered for the Domino's crime.

*Simmons* created a workable rule. The parole-ineligibility instruction is required only when, assuming the jury fixes the sentence at life, the defendant is ineligible for parole under state law. 512 U. S., at 156 (plurality opinion) (limiting holding to situations where "state law prohibits the defendant's release on parole"); *id.*, at 165, n. 5 (relying on fact that Simmons was "ineligible for parole under state law"); *id.*, at 176 (O'CONNOR, J., concurring) (citing state statutes to demonstrate that for Simmons "the only available alternative sentence to death . . . was life imprisonment without [the] possibility of parole"). The instruction was required in *Simmons* because it was agreed that "an instruction informing the jury

that petitioner is ineligible for parole is legally accurate."
*Id.*, at 166.

In this case, a *Simmons* instruction would not have been accurate under the law; for the authoritative determination of the Virginia Supreme Court is that petitioner was not ineligible for parole when the jury considered his sentence. In *Simmons* the defendant had "conclusively established" his parole ineligibility at the time of sentencing. *Id.*, at 158. Ramdass had not. In *Simmons*, a sentence had been imposed for the defendant's prior conviction and he pleaded guilty. Ramdass' Domino's case was tried to a jury and no sentence had been imposed. While a South Carolina defendant might challenge a guilty plea, the grounds for doing so are limited, see *Rivers* v. *Strickland*, 264 S. C. 121, 124, 213 S. E. 2d 97, 98 (1975) ("The general rule is that a plea of guilty, voluntarily and understandingly made, constitutes a waiver of nonjurisdictional defects and defenses, including claims of violation of constitutional rights prior to the plea"); see also *Whetsell* v. *South Carolina*, 276 S. C. 295, 296, 277 S. E. 2d 891, 892 (1981), and, in all events, such a motion cannot seek to set aside a jury verdict or be considered a post-trial motion, for there was no trial or jury verdict in the case. 512 U. S., at 156. *Simmons* further does not indicate that South Carolina law considered a guilty plea and sentence insufficient to render the defendant parole ineligible upon conviction of another crime. Material differences exist between this case and *Simmons*, and the Virginia Supreme Court's decision is not contrary to the rule *Simmons* announced.

Ramdass makes two arguments to equate his own case with *Simmons*. Neither contention refutes the critical point that he was not ineligible for parole as a matter of state law at the time of his sentencing trial. First he contends that the *Simmons* petitioner was not parole ineligible at the time of his sentencing trial. According to Ramdass, a South Carolina prisoner is not parole ineligible until the State

Board of Probation makes a formal determination of parole ineligibility and the state board had not done so when the capital sentencing jury fixed Simmons' penalty. This argument is without merit. Virginia does not argue that Ramdass was parole eligible because a parole board had not acted. It argues Ramdass was still parole eligible at the time of the sentencing trial by reason of his then criminal record as it stood under state law. We further note that Ramdass bases his argument on briefs and the record filed in *Simmons.* A failure by a state court to glean information from the record of a controlling decision here and to refine further holdings accordingly does not necessarily render the state-court ruling "contrary to, or . . . an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." § 2254(d)(1). On review of state decisions in habeas corpus, state courts are responsible for a faithful application of the principles set out in the controlling opinion of the Court.

Second, Ramdass argues *Simmons* allowed a prisoner to obtain a parole-ineligibility instruction even though "hypothetical future events" (such as escape, pardon, or a change in the law) might mean the prisoner would, at some point, be released from prison. This argument is likewise of no assistance to Ramdass. The *Simmons* petitioner was, as a matter of state law, ineligible for parole at the time of the sentencing trial. The State was left to argue that future events might change this status or otherwise permit Simmons to reenter society. *Id.,* at 166. Ramdass' situation is just the opposite. He was eligible for parole at the time of his sentencing trial and is forced to argue that a hypothetical future event (the entry of judgment on the Domino's convictions) would render him parole ineligible under state law, despite his current parole-eligible status. This case is not parallel to *Simmons* on the critical point. The differences between the cases foreclose the conclusion that the Virginia

Supreme Court's decision denying Ramdass relief was contrary to *Simmons*.

Ramdass contends the Virginia Supreme Court nevertheless was bound to extend *Simmons* to cover his circumstances. He urges us to ignore the legal rules dictating his parole eligibility under state law in favor of what he calls a functional approach, under which, it seems, a court evaluates whether it looks like the defendant will turn out to be parole ineligible. We do not agree that the extension of *Simmons* is either necessary or workable; and we are confident in saying that the Virginia Supreme Court was not unreasonable in refusing the requested extension.

*Simmons* applies only to instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison. Petitioner's proposed rule would require courts to evaluate the probability of future events in cases where a three-strikes law is the issue. Among other matters, a court will have to consider whether a trial court in an unrelated proceeding will grant postverdict relief, whether a conviction will be reversed on appeal, or whether the defendant will be prosecuted for fully investigated yet uncharged crimes. If the inquiry is to include whether a defendant will, at some point, be released from prison, even the age or health of a prisoner facing a long period of incarceration would seem relevant. The possibilities are many, the certainties few. If the *Simmons* rule is extended beyond when a defendant is, as a matter of state law, parole ineligible at the time of his trial, the State might well conclude that the jury would be distracted from the other vital issues in the case. The States are entitled to some latitude in this field, for the admissibility of evidence at capital sentencing was, and remains, an issue left to the States, subject of course to federal requirements, especially, as relevant here, those related to the admission of mitigating evidence. *Id.*, at 168; *California* v. *Ramos*, 463 U. S. 992 (1983).

By eliminating *Simmons'* well-understood rule, petitioner's approach would give rise to litigation on a peripheral point. Parole eligibility may be unrelated to the circumstances of the crime the jury is considering or the character of the defendant, except in an indirect way. Evidence of potential parole ineligibility is of uncertain materiality, as it can be overcome if a jury concludes that even if the defendant might not be paroled, he may escape to murder again, see *Garner* v. *Jones*, 529 U. S. 244 (2000); he may be pardoned; he may benefit from a change in parole laws; some other change in the law might operate to invalidate a conviction once thought beyond review, see *Bousley* v. *United States*, 523 U. S. 614 (1998); or he may be no less a risk to society in prison, see *United States* v. *Battle*, 173 F. 3d 1343 (CA11 1999), cert. denied, 529 U. S. 1022 (2000). The Virginia Supreme Court had good reason not to extend *Simmons* beyond the circumstances of that case, which included conclusive proof of parole ineligibility under state law at the time of sentencing.

A jury evaluating future dangerousness under Virginia law considers all of the defendant's recent criminal history, without being confined to convictions. As we have pointed out, the Domino's Pizza conviction was not even a part of the prosecution's main case in the sentencing proceedings. Parole ineligibility, on the other hand, does relate to formal criminal proceedings. The Commonwealth is entitled to some deference, in the context of its own parole laws, in determining the best reference point for making the ineligibility determination. Given the damaging testimony of the criminal acts in the spree Ramdass embarked upon in the weeks before the Kayani murder, it is difficult to say just what weight a jury would or should have given to the possibility of parole; and it was not error for the Commonwealth to insist upon an accurate assessment of the parole rules by using a trial court judgment as the measuring point.

As we have explained, the dispositive fact in *Simmons* was that the defendant conclusively established his parole ineligibility under state law at the time of his trial. Ramdass did not because of the judicial determination Virginia uses to establish a conviction's finality under its parole law. We note that Virginia's rule using judgment in the Domino's case to determine parole ineligibility is not arbitrary by virtue of Virginia's also allowing evidence of the defendant's prior criminal history. To demonstrate Ramdass' evil character and his propensity to commit violent acts in the future, the prosecutor used Ramdass' prior criminal conduct, supported in some cases (although not in the Domino's case) by evidence in the form of the resulting jury verdicts. Virginia law did not require a guilty verdict, a criminal judgment, or the exhaustion of an appeal before prior criminal conduct could be introduced at trial. Virginia law instead permitted unadjudicated prior bad acts to be introduced as evidence at trial. See *Watkins* v. *Commonwealth,* 229 Va. 469, 487, 331 S. E. 2d 422, 435 (1985). For example, the prosecutor was permitted to use the shooting of Selassie in aggravation, even though no verdict had been rendered in that case. The prosecutor likewise asked Ramdass about the July murder in Alexandria. App. 64. (Despite Ramdass' sworn denial, he pleaded guilty to the crime after being sentenced to death in this case.) The guilty verdict of the jury in the Domino's case, therefore, was not a necessary prerequisite to the admissibility of the conduct underlying the Domino's crime. Ramdass, furthermore, could not object to the Commonwealth's use of the Domino's crime at sentencing, for it was he who introduced the evidence. The Commonwealth did not mention the crime in its opening statement and did not present evidence of the crime in its case in chief. Ramdass used the Domino's crime to argue he would never be out of jail; and he overused the crime even for that purpose. Counsel advised the jury the Domino's crime would result in

"[a]t least another life sentence," when in fact the sentence imposed was for 18 years. *Id.*, at 50.

The various public opinion polls to which we are pointed cast no doubt upon the rule adopted by the Commonwealth. We are referred, for example, to a poll whose result is reported in Paduano & Smith, Deathly Errors: Juror Misperceptions Concerning Parole in the Imposition of the Death Penalty, 18 Colum. Human Rights L. Rev. 211 (1987). The poll is said to permit the conclusion that 67% of potential jurors would be more likely to give a life sentence instead of death if they knew the defendant had to serve at least 25 years in prison before being parole eligible.

The poll is not a proper consideration in this Court. Mere citation of a law review to a court does not suffice to introduce into evidence the truth of the hearsay or the so-called scientific conclusions contained within it. Had the creators of the poll taken the stand in support of the poll's application to Ramdass' case, the poll likely would have been demonstrated to be inadmissible. The poll's reporters concede the poll was limited in scope, surveying 40 individuals eligible for jury service. *Id.*, at 221. The poll was limited to jurors in one Georgia county, jurors who would never serve on a Fairfax County, Virginia, jury. The poll was supervised by the Southern Prisoners' Defense Committee, a group having an interest in obtaining life sentences for the inmates it represents. The poll was conducted in the context of ongoing litigation of a particular defendant's death sentence. The article makes no reference to any independent source confirming the propriety of the sampling methodology. The poll asked but four questions. It failed to ask those who were surveyed why they held the views that they did or to ascertain their reaction to evidence supplied by the prosecution designed to counter the parole information. No data indicate the questions were framed using methodology employed by reliable pollsters. No indication exists regarding the amount of time participants were given to answer.

The reporters of the poll contend other similar, limited studies support the results, yet those studies were conducted over the telephone "by defense attorneys in connection with motions for new trials." *Id.*, at 223, n. 35. These, and other, deficiencies have been relied upon by courts with fact-finding powers to exclude or minimize survey evidence. *E. g.*, *Amstar Corp.* v. *Domino's Pizza, Inc.*, 615 F. 2d 252, 264 (CA5 1980) (inadequate survey universe); *Dreyfus Fund, Inc.* v. *Royal Bank of Canada*, 525 F. Supp. 1108, 1116 (SDNY 1981) (unreliable sampling technique); *General Motors Corp.* v. *Cadillac Marine & Boat Co.*, 226 F. Supp. 716, 737 (WD Mich. 1964) (only 150 people surveyed); *Kingsford Products Co.* v. *Kingsfords, Inc.*, 715 F. Supp. 1013, 1016 (Kan. 1989) (sample drawn from wrong area); *Conagra, Inc.* v. *Geo. A. Hormel & Co.*, 784 F. Supp. 700, 726 (Neb. 1992) (survey failed to ask the reasons why the participant provided the answer he selected); *Sterling Drug, Inc.* v. *Bayer AG*, 792 F. Supp. 1357, 1373 (SDNY 1992) (questions not properly drafted); *American Home Products Corp.* v. *Proctor & Gamble Co.*, 871 F. Supp. 739, 761 (NJ 1994) (respondents given extended time to answer); *Gucci* v. *Gucci Shops, Inc.*, 688 F. Supp. 916, 926 (SDNY 1988) (surveys should be conducted by recognized independent experts); *Schering Corp.* v. *Schering Aktiengesellschaft*, 667 F. Supp. 175, 189 (NJ 1987) (attorney contact and interference invalidates poll); see generally *Toys "R" Us, Inc.* v. *Canarsie Kiddie Shop, Inc.*, 559 F. Supp. 1189 (EDNY 1983) (listing factors to consider in determining whether a survey is reliable). The poll reported in the Columbia Human Rights Law Review should not be considered by this Court. See *Stanford* v. *Kentucky*, 492 U. S. 361, 377 (1989) (plurality opinion). It is the Virginia Supreme Court's decision rejecting Ramdass' claims that is under review in this habeas proceeding. It was not required to consult public opinion polls.

Ramdass' claim is based on the contention that it is inevitable that a judgment of conviction would be entered for

his Domino's crime. He calls the entry of judgment following a jury verdict a "ministerial act whose performance was foreseeable, imminent, and inexorable." Brief for Petitioner 21, 36. Petitioner cites no authority for the proposition that a judicial officer's determination that final judgment should be entered (as opposed to the clerk's noting of the final judgment in the record) is a ministerial act. We are not surprised. We doubt most lawyers would consider a criminal case concluded in the trial court before judgment is entered, for it is judgment which signals that the case has become final and is about to end or reach another stage of proceedings. See Va. Sup. Ct. Rule 1:1, 5A:6 (1999) (requiring notice of appeal to be filed "within 30 days after entry of final judgment").

Post-trial motions are an essential part of Virginia criminal law practice, as discussed in leading treatises such as J. Costello, Virginia Criminal Law and Procedure 829 (2d ed. 1995), and R. Bacigal, Virginia Criminal Procedure 337 (2d ed. 1989). Under Virginia Supreme Court Rule 3A:15(b) (1999), a verdict of guilty may be set aside "for error committed during the trial or if the evidence is insufficient as a matter of law to sustain a conviction." A few examples from the reports of Virginia decisions demonstrate it to be well-established procedure in Virginia for trial courts to consider and grant motions to set aside jury verdicts. *E. g.,* *Floyd* v. *Commonwealth,* 219 Va. 575, 576–577, 249 S. E. 2d 171, 172 (1978); *Payne* v. *Commonwealth,* 220 Va. 601, 602–603, 260 S. E. 2d 247, 248 (1979); *Johnson* v. *Commonwealth,* 20 Va. App. 547, 553, 458 S. E. 2d 599, 601 (1995); *Walker* v. *Commonwealth,* 4 Va. App. 286, 291, 356 S. E. 2d 853, 856 (1987); *Gorham* v. *Commonwealth,* 15 Va. App. 673, 674, 426 S. E. 2d 493, 494 (1993); *Carter* v. *Commonwealth,* 10 Va. App. 507, 509, 393 S. E. 2d 639, 640 (1990); *Cullen* v. *Commonwealth,* 13 Va. App. 182, 184, 409 S. E. 2d 487, 488 (1991).

The motion to set aside may be filed and resolved before judgment is entered, *e. g., Walker, supra,* at 291, 356 S. E. 2d, at 856, and trial courts may conduct hearings or allow evidence to be introduced on these motions. Postverdict motions may be granted despite the denial of a motion to strike the evidence made during trial, *e. g., Gorham, supra,* at 674, 426 S. E. 2d, at 494, or after denial of a pretrial motion to dismiss, *Cullen, supra,* at 184, 409 S. E. 2d, at 488. Federal judges familiar with Virginia practice have held that postverdict motions give a defendant a full and fair opportunity to raise claims of trial error, *DiPaola* v. *Riddle,* 581 F. 2d 1111, 1113 (CA4 1978). In contexts beyond the three-strikes statute, Virginia courts have held that the possibility of postverdict relief renders a jury verdict uncertain and unreliable until judgment is entered. *E. g., Dowell* v. *Commonwealth,* 12 Va. App. 1145, 408 S. E. 2d 263, 265 (1991); see also *Smith* v. *Commonwealth,* 134 Va. 589, 113 S. E. 707 (1922); *Blair* v. *Commonwealth,* 66 Va. 850, 858, 861 (1874) (availability of postverdict motions means it is at the defendant's option whether to "let judgment be entered in regular order"). In one recent case, the Virginia Court of Appeals relied on Rule 3A:15 to hold, contrary to petitioner's contention here, that it is an "incorrect statement of the law" to say that the trial court has no concern with the proceedings after the jury's verdict. *Davis* v. *Commonwealth,* No. 2960–98–2, 2000 WL 135148, *4, n. 1 (Va. App., Feb. 8, 2000) (unpublished).

The time for Ramdass to file a motion to set aside the Domino's verdict had not expired when the jury was deliberating on the sentence for Kayani's murder; and he concedes he could have filed postverdict motions. The Domino's case was pending in a different county from the Kayani murder trial and the record contains no indication that Ramdass' counsel advised the judge in the Kayani case that he would not pursue postverdict relief in the Domino's case. The Virginia Supreme Court was reasonable to reject a parole-

ineligibility instruction for a defendant who would become ineligible only in the event a trial judge in a different county entered final judgment in an unrelated criminal case.

Ramdass complains that the Virginia Supreme Court's selection of the entry of judgment rather than the jury verdict is arbitrary. He points out that a trial court may set the judgment aside within 21 days after its entry. Va. Sup. Ct. Rule 1:1 (1999). Appeal is also permitted. We agree with Ramdass that the availability of postjudgment relief in the trial court or on appeal renders uncertain the finality and reliability of even a judgment in the trial court. Our own jurisprudence under *Teague* v. *Lane,* for example, does not consider a Virginia-state-court conviction final until the direct review process is completed. *O'Dell* v. *Netherland,* 521 U. S., at 157. States may take different approaches and we see no support for a rule that would require a State to declare a conviction final for purposes of a three-strikes statute once a verdict has been rendered. Verdicts may be overturned by the state trial court, by a state appellate court, by the state supreme court, by a state court on collateral attack, by a federal court in habeas corpus, or by this Court on review of any of these proceedings. Virginia's approach, which would permit a *Simmons* instruction despite the availability of postjudgment relief that might, the day after the jury is instructed that the defendant is parole ineligible, undo one of the strikes supporting the instruction, provided Ramdass sufficient protection. A judgment, not a verdict, is the usual measure for finality in the trial court.

Our conclusion is confirmed by a review of petitioner's conduct in this litigation. The current claim that it was certain at the time of trial that Ramdass would never be released on parole in the event the jury sentenced him to life is belied by the testimony his counsel elicited from him at sentencing. Ramdass' counsel asked him, "Are you going to spend the rest of your life in prison?" Despite the claim advanced

now that parole would be impossible, the answer counsel elicited from Ramdass at trial was, "I don't know." We think Ramdass' answer at trial is an accurate assessment of the uncertainties that surrounded his parole and custody status at the time of trial. In like manner, before the Virginia Supreme Court's decision now challenged as unreasonable, petitioner had not argued that his parole eligibility should have been determined based on the date of the Domino's verdict (January 7, 1993) rather than the date the judgment was entered (February 18, 1993). He did not mention the three-strikes law at trial, although the Domino's verdict had already been returned. Petitioner's brief to the Virginia Supreme Court on remand from this Court conceded that the appropriate date to consider for the Domino's crime was the date of judgment. His brief states Ramdass "was convicted . . . on 18 February 1993 of armed robbery" and that "[o]f course, the . . . 18 February convictio[n] occurred after the jury findings in this case." App. 123–124. Thus the Virginia Supreme Court treated the Domino's conviction in the manner urged by petitioner. Petitioner's change of heart on the controlling date appears based on a belated realization that the 1988 robbery conviction did not qualify as a strike, meaning that he needed the Domino's conviction to count. To accomplish the task, petitioner began arguing that the date of the jury verdict controlled. His original position, however, is the one in accord with Virginia law.

State trial judges and appellate courts remain free, of course, to experiment by adopting rules that go beyond the minimum requirements of the Constitution. In this regard, we note that the jury was not informed that Ramdass, at the time of trial, was eligible for parole in 25 years, that the trial judge had the power to override a recommended death sentence, or that Ramdass' prior convictions were subject to being set aside by the trial court or on appeal. Each statement would have been accurate as a matter of law, but each statement might also have made it more probable that the

jury would have recommended a death sentence. We further note Virginia has expanded *Simmons* by allowing a defendant to obtain a *Simmons* instruction even where the defendant's future dangerousness is not at issue. *Yarbrough* v. *Commonwealth*, 258 Va. 347, 519 S. E. 2d 602 (1999). Likewise, Virginia has, after Ramdass' conviction, eliminated parole for capital defendants sentenced to life in prison. The combination of *Yarbrough* and the elimination of parole means that all capital defendants in Virginia now receive a *Simmons* instruction if they so desire. In circumstances like those presented here, even if some instruction had been given on the subject addressed by *Simmons*, the extent to which the trial court should have addressed the contingencies that could affect finality of the other convictions is not altogether clear. A full elaboration of the various ways to set a conviction aside or grant a new trial might not have been favorable to the petitioner. In all events the Constitution does not require the instruction that Ramdass now requests. The sentencing proceeding was not invalid by reason of its omission.

### III

The Virginia Supreme Court's decision to deny petitioner relief was neither contrary to, nor an unreasonable application of, *Simmons*. The United States Court of Appeals for the Fourth Circuit was required to deny him relief under 28 U. S. C. § 2254 (1994 ed. and Supp. III), and we affirm the judgment.

*It is so ordered.*

JUSTICE O'CONNOR, concurring in the judgment.

In *Simmons* v. *South Carolina*, 512 U. S. 154 (1994), a majority of the Court held that "[w]here the State puts the defendant's future dangerousness in issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due process entitles the defendant

to inform the capital sentencing jury . . . that he is parole ineligible." *Id.*, at 178 (O'CONNOR, J., concurring in judgment); see also *id.*, at 163–164 (plurality opinion). Due process requires that "a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain.'" *Id.*, at 175 (O'CONNOR, J., concurring in judgment) (quoting *Skipper* v. *South Carolina*, 476 U. S. 1, 5, n. 1 (1986)). Accordingly, where the State seeks to demonstrate that the defendant poses a future danger to society, he "should be allowed to bring his parole ineligibility to the jury's attention" as a means of rebutting the State's case. 512 U. S., at 177. I have no doubt that *Simmons* was rightly decided.

In this case, because petitioner seeks a writ of habeas corpus rather than the vacatur of his sentence on direct appeal, the scope of our review is governed by 28 U. S. C. §2254(d)(1) (1994 ed., Supp. III). Accordingly, we may grant relief only if the Virginia Supreme Court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *ibid.;* see also *Williams* v. *Taylor*, 529 U. S. 362, 402–409 (2000), which in this case is our holding in *Simmons*.

The Virginia Supreme Court concluded that *Simmons* was inapplicable because petitioner "was not ineligible for parole when the jury was considering his sentence." *Ramdass* v. *Commonwealth*, 248 Va. 518, 521, 450 S. E. 2d 360, 361 (1994). The court noted that, under Virginia law, any person who has been convicted of three separate felony offenses of murder, rape, or robbery "by the presenting of firearms or other deadly weapon" "shall not be eligible for parole." Va. Code Ann. § 53.1–151(B1) (1993). It explained that Ramdass was not parole ineligible at the time of his capital sentencing proceeding because the Kayani murder conviction would not constitute his third conviction for purposes of § 53.1–151(B1). Critically, the court held that, although Ramdass had been

found guilty of the armed robbery of a Domino's Pizza restaurant, that verdict did not count as a prior conviction under § 53.1–151(B1) because judgment had not yet been entered on that verdict at the time of Ramdass' capital sentencing proceeding. 248 Va., at 520, 450 S. E. 2d, at 361.

For the reasons explained in the plurality opinion, the Virginia Supreme Court's decision was neither contrary to, nor an unreasonable application of, our holding in *Simmons*. Whether a defendant is entitled to inform the jury that he is parole ineligible is ultimately a question of federal law, but we look to state law to determine a defendant's parole status. In *Simmons*, the defendant had "conclusively establish[ed]" that he was parole ineligible at the time of sentencing, and the "prosecution did not challenge or question [his] parole ineligibility." 512 U. S., at 158. Ramdass, however, was not ineligible for parole when the jury considered his sentence as the relevant court had not yet entered the judgment of conviction for the Domino's Pizza robbery. Were the entry of judgment a purely ministerial act under Virginia law, in the sense that it was foreordained, I would agree with petitioner that "the only available alternative sentence to death [was] life imprisonment without possibility of parole." *Id.*, at 178 (O'CONNOR, J., concurring in judgment). Such circumstances would be "materially indistinguishable" from the facts of *Simmons*. See *Williams* v. *Taylor*, 529 U. S., at 405. It therefore would have been "contrary to" *Simmons* for the Virginia Supreme Court to hold that petitioner was not entitled to inform the jury that he would be parole ineligible. See *ibid*. Where all that stands between a defendant and parole ineligibility under state law is a purely ministerial act, *Simmons* entitles the defendant to inform the jury of that ineligibility, either by argument or instruction, even if he is not technically "parole ineligible" at the moment of sentencing.

Such was not the case here, however. As the plurality opinion explains, the entry of judgment following a criminal

conviction in Virginia state court is not a purely ministerial act, *i. e.*, one that is inevitable and foreordained under state law. The Commonwealth allows criminal defendants to file post-trial motions following a guilty verdict, and trial courts may set aside jury verdicts in response to such motions. See *ante*, at 173–175. Thus, as a matter of Virginia law, a guilty verdict does not inevitably lead to the entry of a judgment order. Consequently, the jury verdict finding petitioner guilty of the Domino's Pizza robbery did not mean that petitioner would necessarily be parole ineligible under state law. Indeed, petitioner himself concedes that there was a "possibility that the Domino's Pizza trial judge could set aside the verdict under Virginia Supreme Court Rule 3A:15(b)." Brief for Petitioner 37.

Petitioner nevertheless contends that the possibility that the trial court would set aside the guilty verdict for the Domino's Pizza robbery was quite remote, and therefore that the entry of judgment was extremely likely. But, as the plurality opinion explains, *Simmons* does not require courts to estimate the likelihood of future contingencies concerning the defendant's parole ineligibility. Rather, *Simmons* entitles the defendant to inform the capital sentencing jury that he is parole ineligible where the only alternative sentence to death is life without the possibility of parole. And unlike the defendant in *Simmons*, Ramdass *was* eligible for parole under state law at the time of his sentencing.

For these reasons, I agree that petitioner is not entitled to the issuance of a writ of habeas corpus. As our decision in *Williams* v. *Taylor* makes clear, the standard of review dictated by 28 U. S. C. § 2254(d)(1) (1994 ed., Supp. III) is narrower than that applicable on direct review. Applying that standard here, I believe the Virginia Supreme Court's decision was neither contrary to, nor an unreasonable application of, our holding in *Simmons*. Accordingly, I concur in the judgment.

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

There is an acute unfairness in permitting a State to rely on a recent conviction to establish a defendant's future dangerousness while simultaneously permitting the State to deny that there was such a conviction when the defendant attempts to argue that he is parole ineligible and therefore not a future danger. Even the most miserly reading of the opinions in *Simmons* v. *South Carolina,* 512 U. S. 154 (1994), supports the conclusion that this petitioner was denied "one of the hallmarks of due process in our adversary system," namely, the defendant's right "to meet the State's case against him." *Id.,* at 175 (O'CONNOR, J., concurring in judgment).

## I

In *Simmons,* we held that "[w]hen the State seeks to show the defendant's future dangerousness . . . the defendant should be allowed to bring his parole ineligibility to the jury's attention—by way of argument by defense counsel or an instruction from the court—as a means of responding to the State's showing of future dangerousness." *Id.,* at 177 (O'CONNOR, J., concurring in judgment). The present case falls squarely within our holding.

There is no question that the Commonwealth argued Ramdass' future dangerousness. *Ante,* at 161. In doing so, it focused almost entirely on Ramdass' extensive criminal history, emphasizing that his most recent crime spree was committed after his mandatory release on parole.[1] Indeed,

---

[1] The prosecution's opening argument began by recounting Ramdass' entire criminal history. App. 8–11. Eight of the nine witnesses the Commonwealth called did little more than relate the details of Ramdass' criminal past. *Id.,* at 12–64. The prosecution's closing argument highlighted the connection between Ramdass' crimes and his prior releases from prison. *Id.,* at 80–82. In fact, it did so on several occasions. *Id.,* at 9 (Ramdass "served time [for the 1988 strong arm robbery conviction] and was finally paroled in May of 1992"); *id.,* at 46–47 (Ramdass "was

the prosecution relied upon the Domino's Pizza robbery—the very crime Virginia has precluded Ramdass from relying upon to establish his parole ineligibility.[2]

There is also no question that Ramdass was denied the opportunity to inform the jury of his parole ineligibility. During the sentencing deliberations, the jury asked the following question: "[I]f the Defendant is given life, is there a possibility of parole at some time before his natural death?" App. 88. Rather than giving any kind of straightforward answer, and rather than permitting counsel to explain petitioner's parole ineligibility, the court instructed: "[Y]ou should impose such punishment as you feel is just under the evidence . . . . You are not to concern yourselves with what may happen afterwards." *Id.*, at 91.

Finally, it is undisputed that the absence of a clear instruction made a difference. The question itself demonstrates that parole ineligibility was important to the jury, and that the jury was confused about whether a "life" sentence truly means life—or whether it means life subject to

---

released on mandatory parole" in 1992, shortly before his most recent crime spree began); *id.*, at 51b–52 (describing Ramdass' 1992 release on mandatory parole).

[2] *Id.*, at 57–59 ("On that next night, August 30th, you did a robbery of the Domino's Pizza over in Alexandria? . . . Well, if the cab driver was shot in the head on August 30th and Domino's Pizza was August 30th, you did them both the same day; didn't you?"); *id.*, at 81 ("August 30th, 1992, he robbed Domino's Pizza at the point of a gun in Alexandria and he robbed Domino's Pizza not long after he shot that Arlington cab driver through the head . . .").

Of course, *Simmons* v. *South Carolina*, 512 U. S. 154 (1994), applies when the prosecution argues future dangerousness; it does not require the State to argue any particular past crime. My purpose in pointing out Virginia's reliance on the Domino's Pizza verdict is to underscore the unfairness of permitting Virginia to use it, while denying Ramdass the same use. The plurality's repeated statement that Virginia brought up the crime in its cross-examination rather than its case in chief, *ante*, at 162, 170, 171, neither means *Simmons* is inapplicable nor mitigates the unfairness here. It only signals the formalism the plurality is prepared to endorse.

the possibility of parole. See *Simmons*, 512 U. S., at 178 (O'CONNOR, J., concurring in judgment) ("[T]hat the jury in this case felt compelled to ask whether parole was available shows that the jurors did not know whether or not a life-sentenced defendant will be released from prison"). More critically, three jurors said that "if the [jury] knew that [Ramdass] would have never gotten out of prison, they would have given him life rather than death." App. 95. Two of them stated "that would have been the result among all of [the jurors] beyond question, if they had had that information." *Ibid.* But "because they weren't told or given the answer . . . they all had a perception that he would be paroled." *Ibid.*[3]

After we remanded for reconsideration in light of *Simmons*, the Virginia Supreme Court held that case did not apply because Ramdass was not "ineligible for parole when the jury was considering his sentence." *Ramdass* v. *Commonwealth*, 248 Va. 518, 520, 450 S. E. 2d 360, 361 (1994). The applicable Virginia statute requires three strikes for a defendant to be parole ineligible. "At the time that the jury was considering Ramdass's penalty on January 30, 1993," the court held, Ramdass "was not ineligible for parole" because he had only two strikes against him—the Pizza Hut robbery and the instant capital murder. *Ibid.* Ramdass' robbery of the Domino's Pizza did not count as his third strike, even though the jury in that case had already found him guilty. Technically, under state law, that did not count as a "conviction," because Virginia's definition of "conviction" is not just a guilty verdict. Rather, a "conviction" also requires a piece of paper signed by the judge entering the verdict into

---

[3] Once again, *Simmons*' applicability does not at all turn on whether this kind of evidence exists. I point it out only to emphasize how real the *Simmons* concerns are here. The plurality complains, in essence, that the evidence came in the form of an uncontested proffer rather than as a sworn affidavit. *Ante*, at 163. Again, neither *Simmons*' applicability nor the reality of the case is undercut by this quibble. The only thing that it proves is the plurality's penchant for formalism.

the record. *Id.*, at 520–521, 450 S. E. 2d, at 361. The trial judge signed the entry of the judgment in the Domino's Pizza case 19 days after the end of the sentencing phase in Ramdass' capital murder proceeding. *Ante*, at 160. Therefore, the Virginia Supreme Court held that at the time "when the jury was considering [petitioner's] sentence" in the capital murder case, Ramdass was "not ineligible for parole" under state law, and thus *Simmons* was inapplicable.

## II

The plurality begins by stating what it thinks is the rule established in *Simmons:* "The parole-ineligibility instruction is required only when, assuming the jury fixes the sentence at life, the defendant is ineligible for parole under state law." *Ante*, at 166. The plurality also adds a proviso: The defendant must be parole ineligible *at the time of sentencing.*[4] Given that understanding, the plurality says "[m]aterial differences exist between this case and *Simmons.*" *Ante*, at 167. But the differences to which the plurality points do not distinguish this case from *Simmons*.

The first asserted distinction is that, as the Virginia Supreme Court stated, Ramdass was not parole ineligible under state law *at the time of sentencing.* Ramdass might

---

[4] Though the plurality does not include the proviso in its initial statement of the rule in *Simmons*, it repeats this requirement no less than 20 times in its 20-page opinion. See *ante*, at 159 ("when the jury considered his case"), 161 ("at the time of the capital sentencing trial"), 163–164 ("at the time of the jury's death penalty deliberations"), 164 ("when the jury was considering his sentence"), *ibid.* ("at the time of the sentencing trial"), *ibid.* ("at the time of his trial"), *ibid.* ("at the time of sentencing"), 165 ("at the time of the jury's future dangerousness deliberations"), 166 ("when the jury deliberated his sentence"), *ibid.* ("at the time of the sentencing trial"), 167 ("when the jury considered his sentence"), *ibid.* ("at the time of sentencing"), *ibid.* ("at the time of his sentencing trial"), *ibid.* (same), 168 ("at the time of the sentencing trial"), *ibid.* (same), *ibid.* ("at the time of his sentencing trial"), 169 ("at the time of his trial"), 171 ("at the time of his trial"), 176 ("at the time of trial").

have become parole ineligible at some later date, but at the exact moment the jury was deliberating that was not yet so. The trouble is, that is not a fact that distinguishes Ramdass' case from Simmons'.

In *Simmons*, the relevant parole statute was S. C. Code Ann. § 24–21–640 (Supp. 1993). See *Simmons*, 512 U. S., at 176 (O'CONNOR, J., concurring in judgment) (citing South Carolina parole law); see also *id.*, at 156 (plurality opinion) (same).[5] Under that statute, it was the South Carolina Board of Probation, Parole, and Pardon Services that determined a defendant's parole eligibility—and that determination would come *after* the sentencing phase. Then-current South Carolina case law unambiguously stated that the eligibility determination would not be made at trial, but by the parole board.[6] Moreover, the statute required the parole board to find that the defendant's prior convictions were not committed "pursuant to one continuous course of conduct," and it was by no means certain that the board would ultimately reach that conclusion. In fact, in *Simmons* the State of South Carolina steadfastly maintained that Simmons was not truly parole ineligible at the time of his sentencing

---

[5] That statute read in part: "The board must not grant parole nor is parole authorized, to any prisoner serving a sentence for a second or subsequent conviction, following a separate sentencing for a prior conviction, for violent crimes as defined in Section 16–1–60. Provided that where more than one included offense shall be committed within a one-day period or pursuant to one continuous course of conduct, such multiple offenses must be treated for purposes of this section as one offense."

[6] See, *e. g., State* v. *McKay*, 300 S. C. 113, 115, 386 S. E. 2d 623, 623–624 (1989).

It is true, as the plurality points out, *ante*, at 167, that in *Simmons* the defendant did have an entry of judgment. But, under the plurality's reasoning, the issue is *whether* the defendant is parole ineligible *at the time of sentencing*, not *why* he is or is not ineligible. Thus, whether the defendant is parole *eligible* at that time because he has no entry of judgment or because the parole board has not yet met is hardly relevant. It is a distinction, but not a material one.

phase because the parole board's determination had not yet been made.[7]   Therefore, the fact that parole ineligibility under state law had not been determined *at the time of sentencing* is simply not a fact that distinguishes *Simmons* from Ramdass' case.[8]

---

[7] "First and foremost, *at the time of the trial,* no state agency had ever determined that Simmons was going to be serving a sentence of life without the possibility of parole, despite the fact that he had earlier pled guilty and been sentenced to a violent crime prior to this trial.   The importance of that distinction is that the power to make that determination did not rest with the judiciary, but was solely vested in an executive branch agency, the South Carolina Board of Probation, Parole and Pardon Services."   Brief for Respondent in *Simmons* v. *South Carolina,* O. T. 1993, No. 92–9059, p. 95 (emphasis added).

The plurality also complains that "a state court [need not] glean information from the record" in *Simmons*.   *Ante,* at 168.   That is true, but it is equally true that a state court cannot pretend that a fact creates a material distinction simply because it was not expressly raised and rejected by this Court.   Moreover, it is evident in the opinion itself that Simmons' parole-ineligibility status had *not* been definitively and legally determined yet at the time of sentencing.   See n. 8, *infra.*

[8] The plurality contends that in *Simmons* "the defendant had 'conclusively established' his parole ineligibility at the time of sentencing." *Ante,* at 167 (quoting *Simmons,* 512 U. S., at 158 (plurality opinion)); see also *ante,* at 171.   What *Simmons* in fact said was that no one questioned that the defendant had all the facts necessary to be found ineligible at some future date.   It does not indicate that a legal determination of the defendant's parole ineligibility had already been definitively made by the parole board.   This is clear in the plurality's citation of the South Carolina parole statute, under which a defendant's parole status is determined by the parole board at a later date.   See *supra,* at 186.   This is also clear from the fact that the plurality relied upon the testimony of the parole board's attorneys, 512 U. S., at 158–159, demonstrating the plurality's recognition that it was the parole board that would ultimately determine Simmons' parole eligibility.   Furthermore, the plurality's statement that Simmons was "*in fact* ineligible," *id.,* at 158 (emphasis added), as opposed to "legally" ineligible or ineligible "as a matter of law," clearly distinguished between the facts as known at that time (which indicated how Simmons' status would, in all likelihood, ultimately be determined), and the *legal* determination of status (which would be formally determined at

Perhaps recognizing that problem, the plurality shifts ground. It is not, the plurality says, "only" whether parole ineligibility under state law has been determined "at the time of sentencing," but whether there is "no possibility" of parole eligibility at that time. *Ante,* at 169. In other words, the plurality says that *Simmons* applies when there is "conclusive proof" *at the time of sentencing* that the defendant will (in the future) "inevitabl[y]" be found parole ineligible. *Ante,* at 170, 173–174. In Ramdass' case, the plurality continues, he would not *inevitably* be parole ineligible, because, under Virginia law, his Domino's Pizza robbery verdict could have been set aside under Virginia Supreme Court Rule 3A:15(b) (1999). That Rule permits a trial court to set aside a guilty verdict up to 21 days after final judgment has been entered. *Ante,* at 174–175.[9]

But again, this is not a fact that distinguishes Ramdass' case from Simmons'. Like Virginia, South Carolina permitted (and still permits) the court to entertain post-trial motions to set aside a verdict and such a motion could have

a later date). Finally, if Simmons' parole ineligibility had been *legally and conclusively* resolved by the time of his trial, there would have been no need for the plurality to discuss (and reject) possibilities that might have undermined Simmons' eventual finding of parole ineligibility. See *infra,* at 201–203.

The *Simmons* plurality did say that "an instruction informing the jury that petitioner is ineligible for parole is legally accurate." 512 U. S., at 166; *ante,* at 166–167. But in the very next sentence the plurality wrote: "Certainly, such an instruction is *more accurate* than no instruction at all." 512 U. S., at 166 (emphasis added). This made it clear that "accuracy," in the sense used there, is a relative term, not an absolute conclusive determination of legal status.

[9] At the time of Ramdass' trial, Rule 3A:15(b) read:

"(b) Motion to Set Aside Verdict.—If the jury returns a verdict of guilty, the court may, on motion of the accused made not later than 21 days after entry of a final order, set aside the verdict for error committed during the trial or if the evidence is insufficient as a matter of law to sustain a conviction."

been filed in Simmons' case.[10] If the availability of such a post-trial procedure makes Ramdass' parole ineligibility less than inevitable, the same must also have been true for Simmons.[11] Accordingly, the mere availability of such a procedure is not a fact that distinguishes the two cases.

In the end, though, the plurality does not really rest upon inevitability at all, nor upon the alleged lack of inevitability represented by the post-trial motion procedure. Instead, the plurality relies upon the fact that at the time of Ramdass' sentencing phase, although the jury had rendered a guilty verdict in the Domino's Pizza robbery case, the trial judge had not yet entered judgment on the verdict. *Ante*, at 160, 167, 173–174, 176. That entry of judgment would come 19 days later. *Ante*, at 160. The distinction is important, the plurality says, because "[a] judgment, not a verdict, is the usual measure for finality in the trial court," *ante*, at 176, whereas a verdict without a judgment is "uncertain," *ibid.* The plurality is, of course, correct that the missing entry of judgment is a circumstance that was not present in *Simmons*.

---

[10] South Carolina Rule of Criminal Procedure 29(b) (1999) reads, in relevant part: "A motion for a new trial based on after-discovered evidence must be made within a reasonable period of time after the discovery of the evidence."

[11] It is true, of course, that a motion for a new trial under South Carolina's rule must be predicated on the discovery of new evidence, but that does not meaningfully distinguish its rule from Virginia's rule, under which a verdict can be set aside only for trial error or insufficient evidence. The plurality says that because Simmons pleaded guilty to his prior crime, he was foreclosed from filing a motion under South Carolina's rule. *Ante*, at 167. For this proposition, the plurality cites *Whetsell* v. *State*, 276 S. C. 295, 277 S. E. 2d 891 (1981). This is just flat wrong. See *Johnson* v. *Catoe*, 336 S. C. 354, 358–359, 520 S. E. 2d 617, 619 (1999) ("*Whetsell* does not stand for the proposition that a defendant who admits his guilt is barred from collaterally attacking his conviction. *Whetsell* stands only for the narrow proposition that a [postconviction relief] applicant who has pled guilty on advice of counsel cannot satisfy the prejudice prong on collateral attack if he states he would have pled guilty in any event").

But the plurality's entirely unsupported assertion that an entry of judgment is more "certain" than a verdict is just flat wrong.

The sole basis for the plurality's conclusion that the Domino's Pizza verdict is uncertain is the possibility that it could be set aside under Rule 3A:15(b). But under that Rule, a guilty verdict may be set aside *even after* judgment has been entered. See n. 9, *supra.* The plurality has cited not a single case suggesting that the standard for setting aside a verdict under Rule 3A:15(b) varies depending on whether or not judgment has been entered. Accordingly, a verdict that is susceptible to being set aside under Rule 3A:15(b) is no more or less certain simply because judgment has been entered on that verdict; whatever the degree of uncertainty is, it is identical in both cases. In short, whether judgment has been entered on the verdict has absolutely no bearing on the verdict's "uncertainty."

The plurality cites 11 Virginia cases to support its argument that Rule 3A:15(b) puts a verdict on shaky ground. *Ante,* at 174–175. The authorities are less than overwhelming. Only 2 of those 11 cases actually mention Rule 3A:15(b),[12] and one of those does so in dicta in a footnote in the unpublished decision of an intermediate state court.[13] Four others make passing reference to *some* sort of post-trial motion that was *denied,* but do so only in the context of reciting the procedural history of the case under review.[14]

---

[12] *Dowell* v. *Commonwealth,* 12 Va. App. 1145, 408 S. E. 2d 263 (1991); *Davis* v. *Commonwealth,* No. 2960–98–2, 2000 WL 135148 (Va. App., Feb. 8, 2000) (unpublished).

[13] See *id.,* at *4, n. 1.

[14] *Floyd* v. *Commonwealth,* 219 Va. 575, 577, 249 S. E. 2d 171, 172 (1978) ("Overruling Floyd's motions to set aside the verdicts . . . , the trial court entered judgments on the verdicts"); *Johnson* v. *Commonwealth,* 20 Va. App. 547, 552, 458 S. E. 2d 599, 601 (1995) ("At Johnson's sentencing hearing, defense counsel made a motion to set aside the verdict . . . . The trial judge denied the motion"); *Walker* v. *Commonwealth,* 4 Va. App. 286, 291, 356 S. E. 2d 853, 856 (1987) ("After the jury was discharged, defendant

Another case also makes passing reference to the denial of a post-trial motion, but it is clear from the fact that the motion was predicated on "new evidence" (which is not a basis for a Rule 3A:15(b) motion, see n. 9, *supra*) and was made four months after the verdict that the motion was almost certainly not based on Rule 3A:15(b).[15] Ultimately, the plurality points to only three cases to demonstrate that "a jury verdict [is] uncertain and unreliable until judgment is entered." *Ante,* at 175 (citing *Dowell* v. *Commonwealth,* 12 Va. App. 1145, 1149, 408 S. E. 2d 263, 265 (1991) (mentioning Rule 3A:15(b)); *Smith* v. *Commonwealth,* 134 Va. 589, 113 S. E. 707 (1922); *Blair* v. *Commonwealth,* 66 Va. 850 (1874)). What these cases hold, however, is (1) that a verdict without an entry of judgment may not be used for purposes of impeaching a witness' credibility; (2) the same may not be used for purposes of a statute permitting the removal from public office of any person "convicted of an act . . . involving moral turpitude"; but (3) the Governor can pardon a prisoner after a verdict and before entry of judgment. Not one of them actually involves a Rule 3A:15(b) motion, nor remotely says that a verdict itself is "unreliable."[16] The

---

moved the court to set aside the verdict; the court denied the motion"); *Carter* v. *Commonwealth,* 10 Va. App. 507, 509, 393 S. E. 2d 639, 640 (1990) ("Carter . . . appeals from judgments of the Circuit Court of Loudoun County . . . which . . . denied his post-trial motions for a new trial").

[15] *Payne* v. *Commonwealth,* 220 Va. 601, 602–603, 260 S. E. 2d 247, 248 (1979).

[16] *Dowell* does say that a verdict without a judgment is not reliable "for impeachment purposes," 12 Va. App., at 1149, 408 S. E. 2d, at 265, but this is a far cry from saying the verdict is itself unreliable. What the three cases actually address is the question whether a verdict is a "conviction" under state law; they say that it depends on the context, answering in the negative in two cases, and in the affirmative in a third.

The plurality also cites two intermediate state-court cases making passing reference to a trial court's granting of a post-trial motion, though neither case mentions Rule 3A:15(b). See *Gorham* v. *Commonwealth,* 15 Va. App. 673, 426 S. E. 2d 493 (1993); *Cullen* v. *Commonwealth,* 13 Va. App. 182, 409 S. E. 2d 487 (1991). But a mere two cases among all the criminal

plurality scrounges to find case law support, but the result barely registers on the radar screen.

Furthermore, the plurality thinks that there is "no authority" for the proposition that entry of judgment is generally considered to be a "ministerial" matter. *Ante*, at 174. In a related context, however, the Virginia Supreme Court has observed:

> "The rendition of a judgment is to be distinguished from its entry in the records. The rendition of a judgment is the judicial act of the court, whereas the entry of a judgment by the clerk on the records of the court is a ministerial, and not a judicial, act. . . . The entry or recordation of such an instrument in an order book˙is the ministerial act of the clerk and does not constitute an integral part of the judgment." *Rollins* v. *Bazile*, 205 Va. 613, 617, 139 S. E. 2d 114, 117 (1964) (citations and internal quotation marks omitted).

In any event, there is a more critical point to be made about the plurality's entry-of-judgment distinction. In relying on that distinction, the plurality is necessarily abandoning the very understanding of *Simmons* that it purports to be following. As explained above, to the extent that the availability of Rule 3A:15(b) motions undermines the inevitability of a defendant's prior verdicts (and therefore his parole ineligibility) under state law, it does so whether or not judgment has been entered on the verdict. So why is it that *Simmons* does not apply when there is no entry of judgment?

The answer simply cannot be that, under state law, and at the time of sentencing, the defendant will not inevitably be

---

cases in Virginia surely demonstrates that setting aside a verdict by post-trial motion is a rarity; if those two instances make the verdict uncertain, then one might as well cite the solitary case in which the Governor granted a pardon after the verdict but before the entry of judgment. See *Blair* v. *Commonwealth*, 66 Va. 850 (1874).

found parole ineligible: the inevitability of the verdict is undermined, equally with or without the judgment; and the defendant is eligible for parole under state law if the verdict is set aside, regardless of whether it is set aside before or after judgment is entered. In fact, though, the plurality really makes no attempt to explain the entry-of-judgment distinction in terms of either the at-the-time-of-sentencing-under-state-law rule, or in terms of the inevitable-under-state-law rule. Rather, the significance of the entry of judgment rests upon the assertion that a judgment is *more certain* than a jury verdict. The entry-of-judgment line, then, is really about relative degrees of certainty regarding parole ineligibility.[17]

If the question is not one in which state law controls (by looking to the defendant's conclusively determined status either at the time of sentencing or inevitably thereafter), the question of *Simmons'* applicability must be an issue of federal due process law. That is a proposition with which I agree entirely; indeed, *Simmons* itself makes that perfectly clear, as I discuss below. Before examining what *Simmons'*

---

[17] Though the plurality insists that judgment "is the usual measure for finality," *ante*, at 176, its own opinion reveals that it does not mean "finality" in any absolute sense. Rather, it concedes that while a "jury verdict [is] uncertain," *ante*, at 175, "even a judgment" is "uncertain" too, because of "the availability of postjudgment relief," *ante*, at 176. What it means, then—though it is not particularly candid about it—is that a judgment is *more certain* than a verdict. Put differently, the plurality thinks a judgment is more enduring, in that there is a greater *probability* that a verdict will survive a motion to set it aside if there has already been an entry of judgment.

It is clear that the significance of the entry of judgment for the plurality must be based on that belief. The significance cannot be that without the entry of judgment the defendant is not ineligible for parole at the exact moment of sentencing; as explained above, that fact is not dispositive. See *supra*, at 185–187. Nor can its significance be that without the entry of judgment, his parole status is not inevitable. As also explained above, the entry of judgment has no significance insofar as inevitability is concerned. See *supra*, at 188–192 and this page.

due process requirements entail, however, it is important to understand the rationale behind *Simmons:* the need for capital sentencing juries to have accurate information about the defendant in the particular area of parole eligibility.

## III

We stated in *Gregg* v. *Georgia,* 428 U. S. 153 (1976):

> "If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a defendant and the crime he committed in order to be able to impose a rational sentence in the typical criminal case, then accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision." *Id.,* at 190 (joint opinion of Stewart, Powell, and STEVENS, JJ.).

This imperative is all the more critical when the jury must make a determination as to future dangerousness. "[A]ny sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what sentence to impose. . . . What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek* v. *Texas,* 428 U. S. 262, 274–276 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.). When it comes to issues such as future dangerousness and the possibility of parole, it is therefore vitally important that "the jury [have] accurate information of which both the defendant and his counsel are aware," including "an accurate statement of a potential sentencing alternative." *California* v. *Ramos,* 463 U. S. 992, 1004, 1009 (1983).

This is not to say, of course, that the Constitution compels the States to tell the jury every single piece of information that may be relevant to its deliberations. See, *e. g., id.,* at

1010–1012.    Indeed, in *California* v. *Ramos,* we held it ordinarily proper to "defe[r] to the State's choice of substantive factors relevant to the penalty determination." *Id.,* at 1001. Notwithstanding the broad discretion recognized in *Ramos,* the latitude to which the States are entitled is not unbounded; at times, it must give way to the demands of due process.

One such due process requirement is that a defendant must have an opportunity to rebut the State's case against him.  *Simmons,* 512 U. S., at 175 (O'CONNOR, J., concurring in judgment).   And "[w]hen the State seeks to show the defendant's future dangerousness, . . . the fact that he will never be released from prison will often be the only way that a violent criminal can successfully rebut the State's case." *Id.,* at 177 (O'CONNOR, J., concurring in judgment).   Accordingly, "despite our general deference to state decisions regarding what the jury should be told about sentencing, . . . due process requires that the defendant be allowed [to bring his parole ineligibility to the jury's attention] in cases in which the only available alternative sentence to death is life imprisonment without possibility of parole and the prosecution argues that the defendant will pose a threat to society in the future."  *Ibid.*

The rationale for the *Simmons* exception to the general rule of *Ramos* is quite apparent.   In *Ramos,* the defendant claimed that if the State were permitted to argue that the Governor could commute a sentence of life without parole, then due process entitled him to tell the jury that the Governor could commute a death sentence as well.   We rejected that argument, however, holding that the information the defendant sought to introduce "would not 'balance' the impact" of telling the jury that the Governor could commute a sentence of life without parole.   463 U. S., at 1011.   Nor would it make the jury "any less inclined to vote for the death penalty upon learning" that information.   *Ibid.*   Nor, finally, were we persuaded that it would "impermissibly impe[l] the

jury toward voting for the death sentence" if the jury were told that a life without parole sentence could be commuted, but were not told that a death penalty could be commuted as well. *Id.*, at 1012.

Each of these factors, however, points in precisely the opposite direction when it comes to information about a defendant's parole ineligibility. If the State argues that the defendant will be a future danger to society, it quite plainly rebuts that argument to point out that the defendant—because of his parole ineligibility—will never be a part of society again. *Simmons*, 512 U. S., at 177 (O'CONNOR, J., concurring in judgment) ("[T]he fact that he will never be released from prison will often . . . rebut the State's case"). And unlike *Ramos*, if the jury is informed of a defendant's parole ineligibility, it is "less inclined to vote for the death penalty upon learning" that fact. Conversely, permitting the State to argue the defendant's future dangerousness, while simultaneously precluding the defendant from arguing his parole ineligibility, does tend to "impe[l] the jury toward voting for the death sentence." Despite the plurality's unsupported remark that "[e]vidence of potential parole ineligibility is of uncertain materiality," *ante*, at 170, all of the available data demonstrate to the contrary.

How long a defendant will remain in jail is a critical factor for juries. One study, for example, indicates that 79% of Virginia residents consider the number of years that a defendant might actually serve before being paroled to be an " 'important consideration when choosing between life imprisonment and the death penalty.' " [18] A similar study reveals that 76.5% of potential jurors think it is "extremely important" or "very important" to know that information when deciding between life imprisonment and the death pen-

---

[18] See Note, The Meaning of "Life" for Virginia Jurors and Its Effect on Reliability in Capital Sentencing, 75 Va. L. Rev. 1605, 1624, and n. 102 (1989) (citing study by National Legal Research Group).

alty.[19]   Likewise, two-thirds of the respondents in another survey stated that they would be more likely to give a life sentence instead of death if they knew the defendant had to serve at least 25 years in prison before being parole eligible.[20]   General public support for the death penalty also plummets when the survey subjects are given the alternative of life without parole.[21]   Indeed, parole ineligibility information is so important that 62.3% of potential Virginia jurors would actually disregard a judge's instructions not to consider parole eligibility when determining the defendant's sentence.[22]

At the same time, the recent development of parole ineligibility statutes results in confusion and misperception, such that "common sense tells us that many jurors might not know whether a life sentence carries with it the possibility

---

[19] Hughes, Informing South Carolina Capital Juries About Parole, 44 S. C. L. Rev. 383, 409–410 (1993) (citing 1991 study by Univ. of South Carolina's Institute for Public Affairs); see also *Simmons*, 512 U. S., at 159 (plurality opinion) (discussing this study).

[20] Paduano & Smith, Deathly Errors: Juror Misperceptions Concerning Parole in the Imposition of the Death Penalty, 18 Colum. Human Rights L. Rev. 211, 223 (1987).

[21] See, *e. g.*, Rising Doubts on Death Penalty, USA Today, Dec. 22, 1999, p. 17A (nationwide 1999 Gallup Poll finds 71% support death penalty; 56% support death penalty when life without parole is offered as an option); Finn, Given Choice, Va. Juries Vote for Life, Washington Post, Feb. 3, 1997, pp. A1, A6 ("According to a poll conducted for the Death Penalty Information Center, which opposes capital punishment, support for the death penalty nationwide falls from 77 percent to 41 percent if the alternative is life without parole accompanied by restitution"); Heyser, Death Penalty on the Rise in Virginia, Roanoke Times, Aug. 31, 1998, p. C3 (reporting study by Virginia Tech's Center for Survey Research, finding that 79% of Virginians "strongly" or "somewhat" support the death penalty, a figure that drops to 57% when respondents are given the alternative of life without parole for 25 years plus restitution); Armstrong & Mills, Death Penalty Support Erodes, Many Back Life Term as an Alternative, Chicago Tribune, Mar. 7, 2000, p. 1 (58% of Illinois registered voters support death penalty; only 43% favor death when given option of life without parole).

[22] See Note, 75 Va. L. Rev., at 1624–1625, and n. 103.

of parole." *Simmons*, 512 U. S., at 177–178 (O'CONNOR, J., concurring in judgment). The statistical data bear this out. One study of potential Virginia jurors asked: "'If a person is sentenced to life imprisonment for intentional murder during an armed robbery, how many years on the average do you think that the person would actually serve before being released on parole?'" The most frequent response was 10 years.[23] Another potential-juror survey put the average response at just over eight years.[24] And more than 70% of potential jurors think that a person sentenced to life in prison for murder can be released at some point in the future.[25]

Given this data, it is not surprising that one study concluded: "[J]urors assessing dangerousness attach great weight to the defendant's expected sentence if a death sentence is not imposed. Most importantly, jurors who believe the alternative to death is a relatively short time in prison tend to sentence to death. Jurors who believe the alternative treatment is longer tend to sentence to life."[26] Consequently, every reason why the Governor's commutation power at issue in *Ramos* was *not* required to be put before the jury leads to precisely the opposite conclusion when it comes to the issue of parole ineligibility. That is exactly why *Simmons* is an exception to the normally operative rule of deference established in *Ramos*.[27]

The plurality—focusing exclusively on one of the many sources cited—criticizes at length (*ante*, at 172–173) these "so-called scientific conclusions" that merely confirm what

[23] See *id.*, at 1624, and n. 101.

[24] See Paduano & Smith, 18 Colum. Human Rights L. Rev., at 223, n. 34.

[25] See Hughes, 44 S. C. L. Rev., at 408; see also Finn, Washington Post, at A6 ("[O]nly 4 percent of Americans believe that convicted murderers will spend the rest of their days in prison").

[26] See Eisenberg & Wells, Deadly Confusion: Juror Instructions in Capital Cases, 79 Cornell L. Rev. 1, 7 (1993).

[27] See *Simmons*, 512 U. S., at 159, 170, n. 9 (plurality opinion) (discussing above data).

every sentencing judge surely knows—that how soon the defendant may actually be released from prison is highly relevant to the sentencing decision. The plurality's criticism yet again underscores the formalistic character of its analysis of the life-or-death issue presented by this case. In exercising the judicial function, there are times when judgment is far more important than technical symmetry.[28]

## IV

The Virginia Supreme Court held that whether *Simmons* applies is a question whose answer is entirely controlled by the operation of state law. See *supra*, at 184–185. This understanding was adopted by the plurality as well, at least as it originally stated the holding of *Simmons*. See *supra*, at 185. But as explained above, the Virginia court's view, as well as the plurality's original stance, simply cannot be reconciled with *Simmons* itself. That might explain why the plurality ultimately abandons that view, instead relying

---

[28] As for the specific criticisms, the plurality first complains that such surveys are inadmissible as evidence. The question, though, is not whether the statistical studies are admissible evidence, but whether they are relevant facts assisting in our determination of the proper scope of the *Simmons* due process right. Surely they are. In any event, Ramdass *did* raise such studies at his sentencing hearing. See App. 95–96. Virginia had its chance to object, but opted not to do so. It is far too late in the day to complain about it now. (Simmons, incidentally, also introduced similar evidence in his trial without objection. See 512 U. S., at 159 (plurality opinion).)

Next, the plurality says that one of the studies I cited focused only on Georgia jurors, as if Georgians have some unique preference for life without parole. In any event, the studies focusing on Virginia jurors yield the same results. See nn. 18, 21, *supra*. Finally, the plurality questions the objectivity of one particular study. Even if the plurality were justified in that criticism, it surely has no basis for questioning the many other sources cited. See n. 19, *supra* (Univ. of South Carolina's Institute for Public Affairs), n. 21 (Gallup Poll and Virginia Tech's Center for Survey Research), n. 26 (study by Associate Professor of Statistics, Dept. of Economic and Social Statistics, Cornell Univ.).

on an assessment of how probable it is that the defendant will be found parole ineligible—or, as the plurality might put it, what is "more certain" under state law.

The plurality is correct to reject the Virginia Supreme Court's holding that state law entirely controls the applicability of *Simmons*. *Simmons* announced a rule of due process, not state law. 512 U. S., at 156 (plurality opinion); *id.*, at 177 (O'CONNOR, J., concurring in judgment). This is not to say that the federal due process right in *Simmons* does not make *reference* to state law, for surely it does; the very reason why *Simmons* is an exception to *Ramos* is because of the consequences of parole ineligibility under state law. But that is not the same thing as saying that the precise, technical operation of state law entirely controls its applicability.

*Simmons* itself makes this perfectly clear. In that case South Carolina argued that "because future exigencies such as legislative reform, commutation, clemency, and escape might allow [Simmons] to be released into society, [Simmons] was not entitled to inform the jury that he is parole ineligible." 512 U. S., at 166, and n. 6 (plurality opinion). Indeed, as noted earlier, it argued that Simmons was not, technically, parole ineligible at the time of sentencing because the state parole board had not yet made its determination. See *supra*, at 186–187.

Yet the plurality opinion rejected outright the argument that "hypothetical future developments" control the issue, finding that South Carolina's argument about state law, while "technically . . . true," and "legally accurate," had "little force." *Simmons*, 512 U. S., at 166, and n. 6.[29] In other words, the due process standard of *Simmons* was not con-

_____

[29] While JUSTICE O'CONNOR's concurring opinion did not make direct reference to those hypothetical possibilities, South Carolina's brief and the plurality's opinion put the issue squarely before the Court. If those hypotheticals had made a difference, the outcome of the case for the concurring opinion would have been precisely the opposite of what it was.

trolled entirely by the technical minutiae of state law, even though it looked at state law for determining when the right to rebut the State's argument was triggered.

It makes perfect sense for *Simmons'* due process right to make reference to, yet not be wholly controlled by, state law. On the one hand, *Simmons* is a limited exception to *Ramos*, and as such it is confined to where the defendant will be parole ineligible—hence the reference to state law. On the other hand, *Simmons* is a constitutional requirement imposed on the States. If its applicability turned entirely on a defendant's technical status under state law at the time of sentencing, the constitutional requirement would be easily evaded by the artful crafting of a state statute. For example, if Virginia can define "conviction" to require an entry of judgment, it could just as easily define "conviction" to require that all final appeals be exhausted, or that all state and federal habeas options be foreclosed. And by delaying when the defendant's convictions count as strikes for parole ineligibility purposes until some point in time well *after* the capital murder sentencing phase, the State could convert the *Simmons* requirement into an opt-in constitutional rule.[30]

*Simmons'* applicability is therefore a question of federal law, and that case makes clear that the federal standard essentially disregards future hypothetical possibilities even if they might make the defendant parole *eligible* at some

---

[30] This is true even if one accepts the premise that *Simmons* requires us to presume that the *most recent* conviction will ultimately count as a strike regardless of what could happen under state law after the sentencing hearing. (The Virginia Supreme Court apparently adopted that view, which explains why that court counted the capital murder verdict as a strike at the time of the sentencing hearing, even though judgment had not yet been entered on the verdict. See *supra,* at 184.) Even accepting that premise, delaying the determination of parole ineligibility status until after the sentencing hearing would still mean that the defendant's *other* prior convictions would not count as strikes until well after the capital murder sentencing phase.

point.[31] The question in this case, then, boils down to whether the plurality's line between entry of judgment and a verdict is a demarcation of *Simmons*' applicability that is (1) consistent with *Simmons;* (2) a realistic and accurate assessment of the probabilities; and (3) a workable, clear rule. I believe the plurality fails on each score.

It is important to emphasize the precise basis for the uncertainty the plurality perceives. The plurality limits the relevant uncertainty to things known *before* the time of sentencing. Events developing the day *after* sentencing, which might lend uncertainty to a defendant's eventual parole ineligibility do not make *Simmons* inapplicable, the plurality says. *Ante,* at 176. What I understand the plurality to be concerned about is whether the facts, as known at or prior to sentencing, cast any doubt on whether, after sentencing, the defendant will become parole ineligible. Even if nothing definitive has happened yet by the time of sentencing, the facts as known at that time might well give rise to uncertainty as to the defendant's parole ineligibility.

The question, then, is what were the facts as known at the time of Ramdass' sentencing that might cast doubt on whether he would be found parole ineligible after sentencing. The facts to which the plurality points are, first, that judgment had not yet been entered on the verdict, and second, that the verdict could have been set aside if Ramdass had

---

[31] The plurality's claim, *ante,* at 169, that Ramdass seeks an extension of *Simmons* is therefore unfounded. And its criticism that "[p]etitioner's proposed rule would require courts to evaluate the probability of future events" ignores the fact that *Simmons* itself did the very same thing. *Ante,* at 169. The irony of that comment, moreover, is that it criticizes the rule for requiring an assessment of the future on the ground that such an inquiry is inherently speculative. Yet speculation about the future is precisely what is required when the jury is asked to assess a defendant's future dangerousness. The speculation, however, becomes reasoned prediction rather than arbitrary guesswork only when the jury is permitted to learn of the defendant's future parole status. See *supra,* at 194–199. Unfortunately, that was not the case here.

filed a motion to set aside the verdict under Rule 3A:15(b) and the trial court had found that motion meritorious. But no motion to set aside the verdict had been filed or was pending; no legal basis for granting such a motion had (or has) ever been identified; and there was not the slightest indication from the Domino's Pizza robbery trial court that such a motion would have been found meritorious if it had been filed. In short, the plurality finds constitutionally significant uncertainty in the hypothetical possibility that a motion, if it had been filed, might have identified a trial error and the court possibly could have found the claim meritorious. The mere *availability* of a procedure for setting aside a verdict that is necessary for the defendant's parole ineligibility is enough, the plurality says, to make *Simmons* inapplicable.

Frankly, I do not see how *Simmons* can be found inapplicable on the basis of such a "hypothetical future developmen[t]." 512 U. S., at 166 (plurality opinion). The plurality offers no evidence whatsoever that this possibility—an "if only" wrapped in a "might have" inside of a "possibly so"— is at all more likely to occur than the "hypothetical future developments" that *Simmons* itself refused to countenance. Why is that possibility of setting aside the verdict any more likely than the fanciful scenarios dismissed in *Simmons?* Why is the certainty diminished merely because the trial judge has not yet entered judgment, when that fact has no bearing on whether a Rule 3A:15(b) motion will be granted? The plurality never tells us, for it simply declares, without support, elaboration, or explanation, that a verdict is more uncertain than a judgment is. See *supra*, at 192–193, and n. 17. The only reason it suggests for why the verdict here was uncertain is rather remarkable—that *Ramdass himself* said so. That is, the plurality relies upon the fact that a convicted murderer with minimal education and a history of drug experimentation including PCP and cocaine, App. 49, said "I don't know" when asked if he could ever be released

from prison. *Ante*, at 177. This evidence is thinner than gossamer.[32]

What's more, the plurality's assessment of certainties is internally inconsistent. As explained earlier, the standard for setting aside a verdict post-trial is the same regardless of whether judgment has been entered. Accordingly, if the verdict was uncertain in the Domino's Pizza case, that was also true for the Pizza Hut conviction. At the time of the sentencing hearing in the capital murder case, the deadline for filing a motion under the Rule had not expired for either the Domino's Pizza verdict or the Pizza Hut conviction. (The time for filing a motion for the Pizza Hut conviction expired on February 12, 21 days after judgment had been entered on that verdict. This was 13 days after the sentencing phase in the capital murder case ended.) Because there was a possibility that the Pizza Hut conviction could have been set aside before judgment was entered on the Domino's Pizza verdict (and therefore before Ramdass technically became parole ineligible), the certainty of the verdict was just as much in doubt for that conviction. The plurality, however, finds the Domino's Pizza verdict uncertain yet casts no doubt on the Pizza Hut conviction. How can this possibly be consistent? The plurality never says.

Finally, the plurality's approach is entirely boundless. If the kind of "hypothetical future developmen[t]" at issue here is sufficient to make *Simmons* inapplicable, would it

---

[32] The plurality also attempts to distinguish the hypotheticals in *Simmons* from those in Ramdass' case by pointing out that the former hypotheticals, if they happened, would do so *after* sentencing. *Ante*, at 168–169. But the entire point of the hypotheticals is not whether they could occur before sentencing, but whether they could occur before the defendant was technically declared parole ineligible. In *Simmons*, that was true right up until the parole board made its determination. Simply because the nuances of state law may create an opportunity for undermining parole ineligibility earlier on does not make the possibility any less hypothetical or undermine the ineligibility any less; the same principle is at work either way.

be sufficient if, rather than having the possibility of a *recent* conviction being set aside by post-trial motion, an *old* prior conviction could be set aside on appeal before judgment had been entered on the Domino's Pizza verdict? Or under a State's postconviction habeas procedure? More to the point, if the mere *availability* of a post-trial procedure to set aside the verdict is enough, is the same true as well for the mere *availability* of an appeal or state habeas review, so long as the time had not expired for either? Old convictions necessary for a defendant's parole ineligibility can be set aside under these procedures as well. And under each procedure those prior convictions could potentially be set aside at the crucial moment.[33]

It is easy, in this case, to be distracted by the lack of an entry of judgment and the recentness of Ramdass' prior convictions. As the above examples demonstrate, however, these facts tend to detract from, rather than elucidate, the relevant issue. If *Simmons* is inapplicable because at least one of the defendant's prior convictions could be set aside before sentencing (or before the third strike becomes final, or before whatever time the plurality·might think is the crucial moment), then it should not matter, under that reasoning, whether it is set aside by post-trial motion, on appeal, or through state (or federal) postconviction relief. What's more, the plurality's reasoning would hold true so long as these procedures are simply *available*. Accordingly, it would not matter whether a defendant's prior strikes were a day old, a year old, or 100 years old. Nor would it matter that judgment had been entered on those prior convictions. So long as such procedures for setting aside old convictions

---

[33] It is true that these old convictions—like the Pizza Hut conviction—have had an entry of judgment and thus would count as strikes. But under state law, a defendant must have three strikes *at the same time* to be parole ineligible. If a strike were set aside before the defendant has all three, he is just as much parole *eligible* as he would be if judgment had never been entered on the verdict.

exist and remain technically available prior to a defendant's capital murder sentencing phase, the defendant's eventual parole ineligibility is just as uncertain at the crucial moment.

The plurality, however, never addresses any of this, but surely its holding today is an invitation to such possibilities. Indeed, if these possibilities make *Simmons* inapplicable, does this not invite the very same circumvention of *Simmons* that would result if the rule turned entirely on state law (see *supra*, at 201), by allowing a State to render *all* prior convictions uncertain simply by holding open *some* theoretical possibility for postconviction relief at all times? Given that appeals and various forms of postconviction relief undermine the certainty of a verdict or a "conviction" every bit as much as does a procedure like Rule 3A:15(b)—indeed, probably more so—the plurality's reasoning either draws an arbitrary line between these types of procedures, or it accepts that all of these possibilities make *Simmons* inapplicable, in which case that due process right is eviscerated entirely.[34] It is abundantly clear that the proclaimed "workable" rule the plurality claims to be following is an illusion. *Ante*, at 166.

No such arbitrary line-drawing is at all necessary to decide this case. It is entirely sufficient simply to hold that Virginia has offered not one reason for doubting that judgment would be entered on the Domino's Pizza robbery verdict or for doubting .Ramdass' eventual parole ineligibility. Certainly it has offered no reason for thinking that the possibil-

---

[34] The plurality says "[t]he Commonwealth is entitled to some deference, in the context of its own parole laws, in determining the best reference point for making the ineligibility determination." *Ante*, at 170; see also *ante*, at 176 ("States may take different approaches and we see no support for a rule that would require a State to declare a conviction final for purposes of a three-strikes statute once a verdict has been rendered"). But the questions here are whether the *federal due process* standard must abide by every state-law distinction, and if not, is abiding by the entry-of-judgment distinction arbitrary, in light of the fact that that distinction has absolutely no bearing on whether the verdict will be set aside?

ity of setting aside the Domino's Pizza robbery verdict is at all more likely than the hypothetical future developments rejected in *Simmons.* This case thus falls squarely within *Simmons.*

Though it is unnecessary to decide it here, a guilty verdict is the proper line. A guilty verdict against the defendant is a natural breaking point in the uncertainties inherent in the trial process. Before that time, the burden is on the State to prove the accused's guilt beyond a reasonable doubt. A guilty verdict, however, means that the defendant's presumption of innocence—with all of its attendant trial safeguards—has been overcome. The verdict resolves the central question of the general issue of guilt. It marks the most significant point of the adversary proceeding, and reflects a fundamental shift in the probabilities regarding the defendant's fate. For that reason, it is the proper point at which a line separating the hypothetical from the probable should be drawn. Moreover, because the State itself can use the defendant's prior crimes to argue future dangerousness after a jury has rendered a verdict—as Virginia did here, see *supra,* at 182–183, and n. 2—that is also the point at which the defendant's *Simmons* right should attach.

## V

In *Williams* v. *Taylor,* 529 U. S. 362, 405 (2000) (opinion of O'CONNOR, J.), we stated the standard for granting habeas relief under 28 U. S. C. § 2254(d)(1): "A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." As I have explained, the Virginia Supreme Court applied *Simmons* as if (a) its applicability was controlled entirely by state law and (b) the defendant's parole ineligibility is determined at the exact moment when the sentencing phase occurs. See *supra,* at 184–185. But state law does not control *Simmons*' applicability, nor does the due process right turn on whether the defend-

ant has already been found parole ineligible at the exact moment of sentencing. *Simmons* itself makes this entirely clear. Both aspects of the Virginia Supreme Court's holding, then, applied a "rule that contradicts the governing law set forth in" *Simmons.*

We also held in *Williams* that "[a] state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." 529 U. S., at 406. The Virginia Supreme Court's decision was also contrary to *Simmons* in this respect. Because the "hypothetical future developments" rejected in *Simmons* are materially indistinguishable from the future possibility here, the Virginia court's decision is contrary to *Simmons.*

Even assuming the correct rule had been applied, the Virginia Supreme Court's decision would be an "unreasonable application" of *Simmons.* That court held that the Pizza Hut conviction would count as a strike, but not the Domino's Pizza robbery verdict. The only distinction is the lack of an entry of judgment, and the only reason that matters is because the verdict may be set aside by a post-trial motion. But that possibility remains identical for both crimes. To disregard one of those hypothetical possibilities but not the other based on a state-law distinction that has absolutely no relevance to the probability that the verdict will be set aside is an unreasonable application of *Simmons.*[35]

---

[35] Three remaining points should be addressed. First, *Teague* v. *Lane,* 489 U. S. 288 (1989), does not bar relief. *Teague's* antiretroactivity doctrine is irrelevant here, as *Simmons* was decided before Ramdass' conviction became final. See 187 F. 3d 396, 404, n. 3 (CA4 1999) (case below). Nor is *Teague's* bar of applying "new rules" on federal habeas review any barrier; because Ramdass' case falls squarely within *Simmons,* that case controls entirely, and no new rule is necessary.

The second point concerns the plurality's suggestion that Ramdass might have waived his *Simmons* claim. See *ante,* at 162–163, 177. It is not necessary to discuss the issue at length. It suffices to note that this

## VI

Nothing in the above arguments should distract us from the fact that this is a simple case. The question turns on whether the hypothetical possibility that the trial judge might fail to sign a piece of paper entering judgment on a guilty verdict should mean that the defendant is precluded from arguing his parole ineligibility to the jury. We should also not be distracted by the plurality's red herring—the possibility of setting aside the verdict by a post-trial motion. Not only is that possibility indistinguishable from the non-exhaustive list of hypothetical future possibilities we dismissed in *Simmons*, but it also fails to distinguish this case from the many other possibilities that are part of the state criminal justice system, and fails to distinguish Ramdass' convictions from each other.

The plurality's convoluted understanding of *Simmons* and its diverse implications necessitate a fair amount of disentangling of its argument. But, once again, this should not divert us from the plain reality of this case. Juries want to know about parole ineligibility. We know how important

---

is precisely the argument that Virginia raised on remand to the Virginia Supreme Court. That court was not persuaded by the argument, nor was any court during the entire state and federal habeas proceedings. See, *e. g.,* App. 219, 225–226, 281–284 (Magistrate's Report) (discussing its own and other courts' rejection of waiver argument); 187 F. 3d, at 402 (case below) (same). It is therefore not surprising that Virginia failed to argue waiver in its brief in opposition and arguments not raised therein are themselves normally deemed waived. See *Caterpillar Inc.* v. *Lewis,* 519 U. S. 61, 75, n. 13 (1996).

Finally, that Ramdass' counsel argued that he would go to jail "for the rest of his life" does not at all satisfy *Simmons'* requirement. *Ante,* at 161. The entire point of *Simmons* is that the jury will often misunderstand what it means to sentence a defendant to "life." Consequently, that Ramdass was able to tell the jury he would get "life" simply does not help unless he is *also* permitted to tell the jury that life means life without the possibility of parole. Indeed, the very fact that the jury's question came *after* counsel made this argument demonstrates that the jury was uncertain about what that statement meant.

it is to their life-and-death decisionmaking. We know how misinformed they are likely to be if we do not give them this information. We know *Simmons* has worked,[36] and we know the States have wholeheartedly embraced it.[37]

Moreover, we know *this jury* thought the information was critical; we know *this jury* misunderstood what a "life" sentence meant; we know *this jury* would have recommended life instead of death if it had known that Ramdass was parole ineligible; and we know *this jury* did not get a clear answer to its question. We also know that Virginia entrusts to the jury the solemn duty of recommending life or death for the defendant. Why does the Court insist that the Constitution permits the wool to be pulled over their eyes?

I respectfully dissent.

---

[36] See, *e. g.*, Finn, Washington Post, at A1 (recounting how, after Virginia adopted life without parole alternative in 1995, and after *Simmons*, "[t]he number of people given the death sentence in Virginia has plummeted," and describing "[s]imilar declines . . . in Georgia and Indiana" as well as in Maryland).

[37] See *Yarbrough* v. *Commonwealth*, 258 Va. 347, 519 S. E. 2d 602 (1999) (extending *Simmons* to apply even when State does not argue future dangerousness); *ante*, at 178.