John BOOTH–EL, Petitioner–Appellee,

v.

Eugene M. NUTH, Warden; J. Joseph Curran, Jr., Respondents–Appellants.

John Booth–El, Petitioner–Appellant,

v.

Eugene M. Nuth, Warden; J. Joseph Curran, Jr., Respondents–Appellees.

Nos. 01–8, 01–10.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 23, 2002.

Decided March 25, 2002.

**ARGUED:** Annabelle Louise Lisic, Assistant Attorney General, Criminal Appeals Division, Office of the Attorney General, Baltimore, Maryland, for Respondents–Appellants. David John Walsh–Little, Baltimore, Maryland; Michael Alan Millemann, Baltimore, Maryland, for Respondents–Appellees. **ON BRIEF:** J. Joseph Curran, Jr., Attorney General of Maryland, Ann N. Bosse, Assistant Attorney General, Criminal Appeals Division, Office of the Attorney General, Baltimore, Maryland, for Respondents–Appellants.

Before WILKINSON, Chief Judge, and WILKINS and GREGORY, Circuit Judges.

Affirmed in part, reversed in part, and remanded with directions to dismiss the petition by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge WILKINS and Judge GREGORY joined.

## OPINION

WILKINSON, Chief Judge.

After his third death sentence for the murder of Irvin and Rose Bronstein was affirmed by the Maryland courts, John Booth–El filed a federal habeas corpus petition. The district court granted in part his petition on the ground that the removal of intoxication as a statutory mitigating factor at his 1990 re-sentencing violated the *Ex Post Facto* Clause. But the court rejected his claims concerning a potentially coercive *Allen* charge, the failure to bifurcate the sentencing hearing, and ineffective assistance of trial counsel.

The State of Maryland appeals and Booth–El cross-appeals. Because federal law provides no grounds for granting Booth-El's habeas petition, we affirm in part, reverse in part, and remand with directions to dismiss the petition.

### I.

On May 20, 1983, Irvin and Rose Bronstein were found dead in their Baltimore home. Both had been bound and gagged, and each had been stabbed twelve times. Their residence had been ransacked and some of their property was missing. Petitioner John Booth–El and William "Sweetsie" Reid were charged with the murders. Booth–El's first trial ended in a mistrial because the prosecution had failed to turn over certain information before trial. *See Booth v. State,* 301 Md. 1, 481 A.2d 505, 505–06 (Md.1984) (*"Booth I"*). In the second trial, Booth–El was convicted of first degree murder, robbery, and conspiracy. He was sentenced to death for the murder of Mr. Bronstein.[1]

Booth–El appealed the sentence, and the Maryland Court of Appeals affirmed.

*Booth v. State,* 306 Md. 172, 507 A.2d 1098, 1103 (Md.1986) (*"Booth II"*). The Supreme Court reversed, however, holding that the introduction of victim impact statements at a capital sentencing proceeding violated the Eighth Amendment. *Booth v. Maryland,* 482 U.S. 496, 509, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), *overruled by Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). A new sentencing proceeding was held, and Booth–El was again sentenced to death. But the Maryland Court of Appeals vacated the sentence because the trial judge had refused to admit evidence relating to parole eligibility. *Booth v. State,* 316 Md. 363, 558 A.2d 1205 (Md.1989) (*"Booth III"*).

A third sentencing hearing was held in the summer of 1990, and Booth–El was once again sentenced to death. The Maryland Court of Appeals affirmed the sentence on direct appeal. *Booth v. State,* 327 Md. 142, 608 A.2d 162 (Md.1992) (*"Booth IV"*). He was then denied post-conviction relief. The Maryland Court of Appeals affirmed the denial, except with respect to an alleged *Brady* violation. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The court remanded for consideration of the claim. *Booth v. State,* 346 Md. 246, 696 A.2d 440 (Md. 1997). After an evidentiary hearing, the post-conviction court denied relief. Booth–El was · denied leave to appeal. *Booth v. State,* 349 Md. 421, 708 A.2d 681 (Md.1998).

In March 1997, Booth–El filed a petition for habeas corpus in the United States District Court for the District of Maryland, raising twenty-four claims. He asserted, *inter alia,* that the 1983 change to

---

1. The prosecution argued that Booth–El killed Mr. Bronstein and Reid killed Mrs. Bronstein. Its theory was based largely on the fact that there were two knives at the crime scene and the Bronsteins' wounds were different.

the Maryland death penalty statute, which removed intoxication from the list of statutory mitigating factors, violated the *Ex Post Facto* Clause of Article I, § 10 of the Constitution. Further, he argued that the trial judge erred in giving an *Allen*-type charge to the sentencing jury after it indicated that it was split on whether he was a first degree principal. *See Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). Moreover, he claimed that he was denied due process when the trial judge refused to bifurcate the 1990 sentencing proceedings. In his view, the jury should have first determined whether he was a first degree principal before any evidence regarding aggravating and mitigating factors was presented. Finally, he alleged ineffective assistance of counsel during his 1984 guilt/innocence trial.

The district court granted in part Booth–El's petition for writ of habeas corpus based on his *ex post facto* claim. It further concluded that his other claims either were procedurally defaulted or did not provide a basis for relief. *See Booth–El v. Nuth,* 140 F.Supp.2d 495, 500 (D.Md. 2001).

The State appeals, and Booth–El cross-appeals the rejection of his claims regarding the *Allen* charge, the failure to bifurcate the sentencing hearing, and ineffective assistance of counsel.

## II.

■ We review *de novo* the district court's decision to grant or deny habeas relief to a state prisoner. *Spicer v. Roxbury Corr. Inst.,* 194 F.3d 547, 555 (4th Cir.1999). In addition, because the state court adjudicated the merits of Booth–El's *ex post facto* claim, our review of its decision is "limited by the deferential standard

... set forth in [28 U.S.C.] § 2254(d), as interpreted by the Supreme Court in *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)." *Bell v. Jarvis,* 236 F.3d 149, 157 (4th Cir.2000) (en banc), *cert. denied, Bell v. Beck,* —— U.S. ——, 122 S.Ct. 74, 151 L.Ed.2d 39 (2001).[2] Thus, federal habeas relief may not be granted unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

■ Clearly established federal law "refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *Williams,* 529 U.S. at 412, 120 S.Ct. 1495. Further, a state-court decision is contrary to the Court's clearly established precedent if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or "confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 405, 406, 120 S.Ct. 1495.

■ Finally, a state-court decision involves an unreasonable application of the Court's precedent if the court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *id.* at 407–08, 120 S.Ct. 1495, or "was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." *Ramdass v. Angelone,* 530 U.S. 156, 166, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000) (opinion of Kennedy, J.). The Court has stressed that

**2.** Because Booth–El filed his habeas petition after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AED-PA"), we apply § 2254(d)(1) as amended by AEDPA. *Penry v. Johnson,* 532 U.S. 782, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001).

**576**

[i]n § 2254(d)(1), Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect." Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Williams,* 529 U.S. at 411, 120 S.Ct. 1495. *See also Bell,* 236 F.3d at 160; *Vick v. Williams,* 233 F.3d 213, 216 (4th Cir.2000), *cert. denied,* 533 U.S. 952, 121 S.Ct. 2596, 150 L.Ed.2d 754 (2001).

### III.

#### A.

At the time the Bronsteins were murdered, Maryland's death penalty statute listed several mitigating circumstances, including intoxication. Md. Ann.Code art. 27, § 413(g)(4) (1957). Effective July 1, 1983, intoxication was removed from that section. Both before and after the 1983 change, the statute contained a catch-all provision which allowed the jury to consider "[a]ny other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case." § 413(g)(8) (1957, 2001). The Maryland Court of Appeals described the effect of the change:

[Previously] the burden was on the murderer to prove by a preponderance of the evidence diminished capacity as a result of intoxication. If the jury found that fact, then the statute determined that [it] was mitigating and that it was to be considered in weighing whether the aggravating circumstance outweighed intoxication and any other mitigating circumstances. After the change, the murderer has the burden of proving by a preponderance of the evidence both the fact of diminished capacity due to intoxication and that [it] is a mitigating circumstance.

*Booth IV,* 608 A.2d at 175 (citations omitted).

During the 1990 sentencing proceedings, Booth–El asked that the verdict form contain the pre-amendment language, but his request was denied. On direct appeal, he argued that the refusal to include that language on the verdict sheet violated the *Ex Post Facto* Clause because it required him to prove by a preponderance of the evidence that intoxication was a mitigating circumstance.

The Maryland Court of Appeals found no constitutional violation because the change did not fit into one of the "three" categories of *ex post facto* laws identified in *Collins v. Youngblood,* 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). *Booth IV,* 608 A.2d at 175. These categories include: (1) punishing as a crime an act previously committed, which was innocent when done; (2) making the punishment for a crime more burdensome after its commission; and (3) depriving one charged with a crime of any defense available at the time the act was committed. *Collins,* 497 U.S. at 42, 110 S.Ct. 2715 (quoting *Beazell v. Ohio,* 269 U.S. 167, 169–70, 46 S.Ct. 68, 70 L.Ed. 216 (1925)). The state court further held that the change was merely procedural. *Booth IV,* 608 A.2d at 175.

The district court disagreed. It found that "[t]he change in the statute that was applied to Booth–El, which effectively lowered the prosecution's burden of proof by increasing the burden placed on the defendant, falls within the fourth *ex post facto* category." *Booth–El,* 140 F.Supp.2d at 514. This category encompasses "[e]very law that alters the legal rules of evidence,

and receives less, or different testimony, than the law required at the time of the commission of the offence, in order to convict the offender." *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798). The district court noted that the "continuing vitality" of this category was recently affirmed in *Carmell v. Texas,* 529 U.S. 513, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000). *Booth–El,* 140 F.Supp.2d at 513. It then held that the state court's "conclusion that the statutory amendment in Booth–El's case did not fit into any of the *ex post facto* categories violate[d] Supreme Court precedent and therefore [wa]s contrary to clearly established federal law," as well as "constitute[d] an unreasonable application of clearly established federal law." *Id.* at 514, 517.

## B.

■ We underscored above the now-familiar standard of review in habeas cases because it severely restrains the authority of the federal courts, and because, as John Hart Ely once noted in a different context, "[f]amiliarity breeds inattention." John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review* 18 (1980). In looking afresh at the district court's grant of the writ, the question before us is not whether the state court misconstrued or unreasonably applied *present* Supreme Court precedent when it failed to consider the fourth category of *Ex Post Facto* Clause violations. Rather, the issue is whether that category was "clearly established" at the time of the state court decision. It clearly was not.[3]

To begin with, the Supreme Court's clarification in *Carmell* that the fourth category continues to exist, *see* 529 U.S. at 521–25, 537–39, 120 S.Ct. 1620, is not ger-

mane to this inquiry. In *Carmell,* the Court held that an amendment to a Texas statute removing the requirement that a victim's testimony be corroborated in certain sexual offense cases fell within the fourth category of *Ex Post Facto* Clause violations. *Id.* at 530–31, 120 S.Ct. 1620. Nevertheless, *Carmell* came down almost eight years after the decision of the Maryland Court of Appeals in the case at bar. *Carmell* thus does not meet the requirement that the guiding precedent of the Court be "as of the time of the relevant state-court decision." *Williams,* 529 U.S. at 412, 120 S.Ct. 1495.

In addition, as far back as *Beazell,* the Supreme Court identified the types of *Ex Post Facto* Clause violations without so much as mentioning *Calder's* fourth category. 269 U.S. at 169–70, 46 S.Ct. 68. The Court offered this explanation for the exclusion:

> Expressions are to be found in earlier judicial opinions to the effect that the constitutional limitation may be transgressed by alterations in the rules of evidence or procedure. *See Calder v. Bull* . . . . But it is now well settled that statutory changes in the mode of trial or the rules of evidence, which do not deprive the accused of a defense and which operate only in a limited and unsubstantial manner to his disadvantage, are not prohibited.

*Beazell,* 269 U.S. at 170, 46 S.Ct. 68.

Even more significantly, the Supreme Court in *Collins* appeared to validate *Beazell's* omission of the fourth category in holding that a Texas statute allowing an appellate court to reform an improper verdict rather than order a new trial did not violate the *Ex Post Facto* Clause. 497

---

3. If the fourth category was not clearly established, then the state court could not have acted contrary to or unreasonably applied

clearly established federal law by discounting it.

U.S. at 39, 110 S.Ct. 2715. The Court first reproduced *Beazell's* "confident[ ] summar[y]" of the three-fold meaning of the Clause. *Id.* at 42, 110 S.Ct. 2715. Then, after noting that "[t]he *Beazell* definition omits the reference by Justice Chase in *Calder* . . . to alterations in the 'legal rules of evidence,'" the Court explained that "cases subsequent to *Calder* make clear" that "this language was not intended to prohibit the application of new evidentiary rules in trials for crimes committed before the changes." *Id.* at 43 n. 3, 110 S.Ct. 2715. Further, the Court stated without qualification that "[t]he *Beazell* formulation is faithful to our best knowledge of the original understanding of the *Ex Post Facto* Clause: Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts." *Id.* at 43, 110 S.Ct. 2715. Indeed, *Collins* ends by reiterating that the Constitution contemplates only three types of *Ex Post Facto* Clause violations:

> The Texas statute allowing reformation of improper verdicts does not punish as a crime an act previously committed, which was innocent when done; nor make more burdensome the punishment for a crime, after its commission; nor deprive one charged with crime of any defense available according to law at the time when the act was committed. Its application to respondent therefore is not prohibited by the *Ex Post Facto* Clause of Art. I, § 10.

*Id.* at 52, 110 S.Ct. 2715. *See also Cal. Dep't of Corr. v. Morales,* 514 U.S. 499, 504–505, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995) (identifying the types of *ex post facto* laws without mentioning the fourth category).

This textual evidence accounts for Justice Ginsburg's observation in *Carmell* that if one considers "the context of the full text of the *Collins* opinion," then "a strong case can be made that *Collins* pared the number of *Calder* categories down to three, eliminating altogether the fourth category." 529 U.S. at 567, 120 S.Ct. 1620 (Ginsburg, J., dissenting). And the Chief Justice, who wrote the opinion in *Collins,* joined Justice Ginsburg's dissent in *Carmell.* Indeed, even the *Carmell* majority acknowledged that "*Collins* is rather cryptic" on the status of the fourth category. *Id.* at 538, 120 S.Ct. 1620.[4]

Thus, all of the Justices in *Carmell* agreed that *Collins* did not offer clear guidance on the present viability of the fourth category. Further, it made eminent sense for the Maryland Court of Appeals to rely on *Collins,* for it had been decided only two years earlier. In view of these critical facts, we are compelled to conclude that the district court erred in holding that the state court acted contrary to or unreasonably applied clearly established federal law. When the state court rendered its decision, there was nothing clearly established about the fourth category. It was therefore not unreasonable for the state court to discount it.

### C.

■ The district court erred for another reason. After stating that "'[p]rocedural' changes, even those which disadvantage a defendant, do not fall into any of the four *Calder* categories and therefore do not violate the *Ex Post Facto* Clause," the court went on to hold that the change in § 413(g)(4) was not procedural:

---

4. None of this is to suggest that *Beazell* and *Collins* unambiguously did away with the fourth category. *See Carmell,* 529 U.S. at 537–38, 120 S.Ct. 1620 (discussing contrary textual evidence). Rather, the dispositive point is that those decisions rendered that category far from clearly established at the time of the state court decision.

It does not alter the type of evidence that is admissible during the sentencing proceeding, nor does it merely change the procedure for determining mitigating circumstances. Rather, it imposes on the defendant an additional burden, i.e., he must now show not only that intoxication substantially impaired his ability to appreciate the criminality of his conduct or conform his conduct to the requirements of law, but also that this constitutes a mitigating circumstance. The amendment thus imposes an impermissible change in the amount or degree of proof.

*Booth–El,* 140 F.Supp.2d at 514–15 (footnote omitted).

But "[t]he Constitution deals with substance, not shadows." *Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 325, 18 L.Ed. 356 (1866). The amendment did not change the elements of the crime of first-degree murder during the commission of a robbery. Nor did it alter the fact that this crime was punishable by death in Maryland, a fact of which pre-existing state law gave Booth–El clear notice. The amendment also did not remove intoxication as a possible mitigating circumstance in death penalty proceedings. Indeed, it did not remove any mitigating factors from the jury's consideration.

Further, after the amendment the defendant continued to have the burden of producing evidence of intoxication and of persuading as many jurors as possible to find as a fact that he was intoxicated. The district court failed to make a critical distinction between the concepts of consideration and weight. As the state court of appeals explained, "[b]oth before and after the 1983 amendment, the amount of weight to be given to intoxication as a mitigating circumstance turned on the judgment of each individual juror." *Booth IV,* 608 A.2d at 175. So, for example:

a juror who finds that the defendant was intoxicated and who is instructed that intoxication is to be considered as a mitigating circumstance but who personally believes that intoxication does not excuse responsibility for one's conduct, will give very little weight in the balancing process to intoxication when honoring a statutory declaration that it is a mitigating circumstance.

*Id.* at 175 n. 10, 608 A.2d 162. The amendment merely altered the procedure for determining whether the fact of intoxication, if found, is mitigating. And it did so only modestly. This was a "change [ ] in the procedures by which a criminal case is adjudicated, as opposed to [a] change[ ] in the substantive law of crimes." *Collins,* 497 U.S. at 45, 110 S.Ct. 2715.

Indeed, this procedural change is far less disadvantageous to defendants such as Booth–El than several others which have been found not to violate the *Ex Post Facto* Clause. *See, e.g., Collins,* 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30; *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); *Evans v. Thompson,* 881 F.2d 117 (4th Cir.1989); *United States v. Mest,* 789 F.2d 1069 (4th Cir. 1986). For example, in *Dobbert* ten of twelve jurors in a capital case recommended life imprisonment. The trial judge overruled the jury and imposed the death penalty. Under the law in effect at the time of the murders, the jury's recommendation was binding on the trial judge. But the law was changed, rendering the jury's view advisory at the time of the trial. 432 U.S. at 287–91, 97 S.Ct. 2290. The Supreme Court found no *Ex Post Facto* Clause violation because "[t]he new statute simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment at-

tached to the crime." *Id.* at 293–94, 97 S.Ct. 2290.

The district court in the case at bar attempted to distinguish *Dobbert,* observing that

> the change in the law could just as easily have benefitted the defendant as the government. The jury could have imposed death and been overruled by a judge who felt that life imprisonment was more appropriate.... The ameliorative quality of the law in *Dobbert* is absent from the change in Maryland's law.

*Booth–El,* 140 F.Supp.2d at 516–17. But the defendant in *Dobbert* would probably not be very impressed by this distinction. After all, the change in Florida law was the very antithesis of ameliorative as applied to him. Without exaggeration, the effect on Booth–El of the amendment at issue here fades into insignificance when compared with the retrospective imposition of the death penalty in *Dobbert.*

In no important way does Booth–El find himself in a disadvantaged position in the wake of amended § 413(g)(4). We thus fail to see how this procedural change "affect[s] matters of substance," *Beazell,* 269 U.S. at 171, 46 S.Ct. 68, by depriving defendant of "the substantial protections with which the existing law surrounds the person accused of crime," *Duncan v. Missouri,* 152 U.S. 377, 382–83, 14 S.Ct. 570, 38 L.Ed. 485 (1894), or by arbitrarily infringing "substantial personal rights." *Malloy v. South Carolina,* 237 U.S. 180, 183, 35 S.Ct. 507, 59 L.Ed. 905 (1915). *See also Collins,* 497 U.S. at 45, 110 S.Ct. 2715. We therefore must reverse the district court's grant of a writ of habeas corpus on this claim.

## IV.

Booth–El next contends that the sentencing judge erred in giving an impermissibly coercive instruction, *see Allen,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528, after the jury indicated that it was split on whether Booth–El was a first degree principal. Instead of giving the instruction, Booth–El claims the judge should have dismissed the jury and imposed a sentence of life in prison. *See* Md. Ann.Code art. 27, § 413(k)(2).

■ There is no doubt that "[a]ny criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps,* 484 U.S. 231, 241, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). Yet, the Supreme Court in *Allen* specifically approved the use of supplemental jury instructions. 164 U.S. at 501–02, 17 S.Ct. 154. An *Allen* charge is given by a court when the jury has reached an impasse in its deliberations and is unable to reach a consensus. *Id.; United States v. Burgos,* 55 F.3d 933, 935–36 (4th Cir. 1995). The decision to give such a charge is within the discretion of the trial or sentencing court. *Burgos,* 55 F.3d at 935.

■ In this case, the sentencing jury began deliberations at 3:00 p.m. on August 15, 1990. At 7:10 p.m., the jury was sent home for the night. Deliberations resumed at 9:17 a.m. the next morning. At approximately 2:25 p.m., the jury sent a note to the judge which said, "We are split on Question 1, Section 1. We are unable to come to an agreement on that statement." [5] Under Maryland law, a hung

---

5. Question 1, Section 1 read as follows:

Based upon the evidence, we unanimously find that each of the following statements marked "proven" has been proven BE- YOND A REASONABLE DOUBT and that each of those statements marked "not proven" has not been proven BEYOND A REASONABLE DOUBT.

jury in a capital sentencing proceeding would result in imposition of a sentence of life imprisonment. *See* Md. Ann.Code art. 27, § 413(k)(2). Upon learning of the question from the jury, Booth–El requested that the jury be discharged and a sentence of life imprisonment be imposed. The judge denied Booth–El's request and, instead, delivered an *Allen* charge in which he re-instructed the jury on the law and advised them to continue deliberations in an attempt to reach agreement.[6] The jury resumed deliberations at 2:45 p.m. The jury requested to be excused at 5:50 p.m. At that time, Booth–El again asked that the jury be discharged and a life sentence imposed. The judge denied the request and excused the jury. At 9:00 a.m. the next morning, after Booth–El renewed his request that the jury be discharged and it was again denied, deliberations resumed. The jury announced it had reached a verdict at 2:25 p.m. After listening to seven days of evidence, the jury returned a sentence of death after slightly less than eighteen hours of deliberations over three days.

 In an attempt to argue that the jury was "coerced" into giving him a death sentence, Booth–El suggests that this court should speculate about what may have been going on in the minds of the jurors when they heard the *Allen* charge. For example, Booth–El contends that jurors in the minority might have believed that the judge thought they were "confused" and "irresponsible," and that the charge was a judicial suggestion to accept the majority's position. However, in reviewing the propriety of an *Allen* charge, the issue is not what the jurors might have been thinking. Rather, it is whether the instruction given by the trial court "in its context and under all the circumstances" was coercive. *Lowenfield,* 484 U.S. at 237, 108 S.Ct. 546 (internal quotations omitted).

The Maryland Court of Appeals declined to hold that an *Allen* charge was coercive simply because it was used in a capital sentencing proceeding. *Booth IV,* 608 A.2d at 170. It then examined the sentencing judge's instruction in light of *Lowenfield* and found that the "ultimate paragraph" of the instruction in this case was substantially the same as the one found not to be coercive in *Lowenfield. Id.* at 169, 608 A.2d 162. Both the charge in this case and the one in *Lowenfield* instructed each juror to "decide the case for yourself" and to deliberate with the objective of

---

1. The defendant was a principal in the first degree to the murder.

6. The sentencing court's supplemental charge to the jury was as follows:

I am going to reread to you the charge on the law so that you are clear as to what your responsibilities are in that area.

The law requires that in order for you to conclude beyond a reasonable doubt that the State has proven that Mr. Booth was a first degree principle in the murder of Mr. Bronstein, all of you must agree within a reasonable time, and your verdict must be unanimous.

If any of you cannot conclude that the State has proven beyond a reasonable doubt that Mr. Booth is a principal in the murder of Mr. Bronstein, then you must mark "not proven" in the form and enter the words "life imprisonment" in Section 6.

In arriving at your decision, you must consult with one another and deliberate with a view to reaching an agreement, if you can do so without violence to your individual judgment.

Each of you must decide the case for yourself, but you must do so only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, do not hesitate to re-examine your own views. You should change your opinion if convinced you are wrong, but do not surrender your honest belief as the weight or effect of the evidence only because of opinions of your fellow jurors, or for the mere purpose of reaching a verdict.

reaching an agreement "if you can do so without violence to [your] individual judgment." *Lowenfield*, 484 U.S. at 235, 108 S.Ct. 546; *Booth IV*, 608 A.2d at 166. These instructions were designed to encourage further deliberations, not to coerce jurors in the minority to change their vote. The Court of Appeals specifically noted that the charge given was not directed at the minority. *Booth IV*, 608 A.2d at 170. And the court held that "[n]or, considering the evidence and the seriousness of the matter to Booth and to the community, did the court abuse its discretion in repeating the *Allen*-type instruction." *Id.* at 170, 608 A.2d 162.

Additionally, as the district court noted, "the traditional indicia of coercion are not present in this case." *Booth–El*, 140 F.Supp.2d at 524; *see Tucker v. Catoe*, 221 F.3d 600, 611 (4th Cir.2000). The jury deliberated for "slightly less than eighteen hours over three days." *Booth–El*, 140 F.Supp.2d at 524. In light of the gravity of the issue before the jury and the seven days of evidence presented, the total amount of time spent deliberating did not indicate coercion. *Id.; see Tucker*, 221 F.3d at 611. When the *Allen* charge was given, the jury had deliberated for approximately nine hours over two days. It was not unreasonable after nine hours for the sentencing judge to send the jury back for further deliberations. At the time, the judge "did not know the numerical division of the jury." *Booth–El*, 140 F.Supp.2d at 524. Finally, the sentencing judge "did not advise the jury that a unanimous verdict was required." *Id.* Rather, the judge instructed the jury that, "while a finding that Booth–El was a first degree principal must be unanimous, if 'any' juror did not agree with that conclusion, the jury 'must mark not proven on the form and enter the words life imprisonment.'" *Id.* There is simply no evidence that the *Allen* charge

coerced the jury into imposing a sentence of death.

It was not, therefore, an abuse of discretion for the sentencing court to issue the *Allen* charge in this case. The district court correctly determined that the Maryland Court of Appeals' decision did not represent a contravention of or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1); *see also Williams*, 529 U.S. at 405–12, 120 S.Ct. 1495.

## V.

 Booth–El also argues that he was denied due process when the judge refused to bifurcate the 1990 sentencing proceeding, so that the jury would determine whether he was a first degree principal before any evidence regarding aggravating and mitigating factors was presented. In Maryland, a defendant must be a principal in the first degree to be eligible for the death penalty, except in murder for hire cases. Md. Ann. Code art. 27, § 413(e)(1). The sentencing judge or jury determines whether the defendant was a principal in the first degree. *Booth–El*, 140 F.Supp.2d at 508.

 As the Maryland Court of Appeals noted, Booth–El had been found guilty of murder in the first degree before the sentencing phase even began. *Booth IV*, 608 A.2d at 171. Under Maryland law, there is no error in considering principalship, along with the aggravators and mitigators, in a single sentencing proceeding. *Id.* at 170–71, 608 A.2d 162. States are free to select, within constitutional limits, what procedure to use in death penalty proceedings. The fact that other states have made a different choice than Maryland is of no consequence. Therefore, the Maryland Court of Appeals' decision rejecting this claim was not "contrary to, or an unreasonable application of clearly es-

tablished Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Williams*, 529 U.S. at 405–12, 120 S.Ct. 1495.[7]

## VI.

Finally, Booth–El claims that he received constitutionally ineffective assistance of counsel during the guilt phase of his 1984 trial. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Booth–El contends that his lawyers failed to investigate and present readily available evidence tending to disprove that Booth–El killed Mr. Bronstein, and also failed to object to one of the three venire panels from which the trial jurors were selected. Neither of these claims provides a basis for habeas relief.

 The standard of review is a deferential one. We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. To succeed on his claim, Booth–El must show that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. 2052. Booth–El has failed to meet this standard.

### A.

 First, Booth–El claims that his lawyers were ineffective because they failed to investigate and present certain forensic evidence relating to the presence of two knives at the scene. Essentially, it appears that Booth–El contends defense counsel should have presented evidence that one knife found at the scene could have been used to kill both of the Bronsteins and that this evidence could have raised doubt in the juror's minds regarding the prosecution's theory that Booth–El killed Mr. Bronstein and Reid killed Mrs. Bronstein. However, during the 1990 resentencing proceedings, Booth–El presented a forensic expert who testified that the second knife at the scene had not been used to kill either of the Bronsteins. Nevertheless, the sentencing jury concluded that Booth–El was a principal in the first degree in Mr. Bronstein's murder. Since the sentencing jury had the benefit of the forensic expert and still concluded beyond a reasonable doubt that Booth–El was a principal in the first degree, the state post-conviction court found that Booth–El had failed to meet the second prong of the *Strickland* test. And the district court properly held the decision that the outcome of the trial would not have been changed was not an unreasonable application of the second prong of *Strickland*. *Booth–El*, 140 F.Supp.2d at 531.

### B.

 Second, Booth–El argues that one of the three panels from which jurors were selected for the guilt phase of his 1984 trial

**7.** Booth–El further asserts that, when considered along with the sentencing court's refusal to bifurcate his sentencing hearing, the court's refusal to allow him to testify without being subject to cross examination on details of the crimes effectively denied him the right to present sworn testimony on non-principal-ship mitigating factors. As the district court correctly noted, the Supreme Court has not addressed the issue of whether a capital defendant has a constitutional right to testify in a sentencing proceeding without being cross-examined. Yet, both the Maryland Courts of Appeals and this circuit have rejected Booth–El's argument. *See Booth IV*, 608 A.2d at 172–73; *United States v. Barnette*, 211 F.3d 803, 820 (4th Cir.2000). Thus, the Maryland Court of Appeals' decision was not an unreasonable application of clearly established federal law.

was tainted. He contends that counsel was ineffective for failing to object to that panel. His evidence consists of, *inter alia,* voir dire statements of certain panel members that they had overheard conversations in the jury room about the case and that they were afraid. Yet, as the state post-conviction court noted, one of Booth–El's lawyers testified at the post-conviction hearing that he found the jury to be "highly desirable." Indeed, counsel specifically declined to object to the entire jury array at trial, and each of the jurors impaneled answered under oath that he or she could be impartial. And the post-conviction court noted that none of the members of the second panel identified as potential problems actually served on the final jury.

Once again, Booth–El's claim of prejudice is purely speculative. Defense counsel made a tactical decision to preserve the jury that had already been selected. There is no evidence that counsel's actions were unreasonable or resulted in actual prejudice, as required by *Strickland.* Thus, the district court properly concluded that the post-conviction court's conclusions were a reasonable application of clearly established federal law. *See Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

## VII.

Booth–El's case has become perhaps a textbook example of a protracted capital proceeding. Throughout that proceeding, the Maryland courts have not only been attentive to his rights, but have bent over backwards to protect them. Perforce there has been no contravention or unreasonable application of clearly established federal law. For the foregoing reasons, the judgment of the district court is affirmed in part, reversed in part, and re-manded with directions to dismiss the petition.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*